In re William J. BEVERLY, Debtor.

Edward M. Wolkowitz, Appellant,

v.

Stephanie Beverly;  William J. Beverly, Appellees.

Catherine Outland;  Administrator of the Estate of Christine Martell;  Susan Outland Gleason, Appellants,

v.

Edward M. Wolkowitz, Chapter 7 Trustee;  William J. Beverly, Appellees.

BAP Nos. CC–06–1250–KBN, CC–06–1449–KBN, CC–06–1273–KBN, CC–06–1284–KBN.

Bankruptcy No. LA 04–29840 TD.

Adversary Nos. LA 05–01254 TD, LA 05–01257 TD, LA 05–01649 TD.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 21, 2007.

Filed July 24, 2007.

Sidney Lanier, Ayscough & Marar, Torrance, CA, for Edward M. Wolkowitz.

Dennis E. McGoldrick, Torrance, CA, for William J. Beverly.

Before: KLEIN, BRANDT and NIELSEN *, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

The bankruptcy planning dispute presented in these related appeals requires us to transit waters made turbulent by cross-currents of exemptions, fraudulent transfer, denial of discharge, and divorce. We publish to dispel the myth that the toleration of bankruptcy planning for some purposes insulates such planning from all adverse consequences—it does not. In matters of bankruptcy and insolvency planning, supposed safe harbors from one danger are exposed to dangers from other quarters and may, in any event, be too small to shelter large capital transactions.

Here, a lawyer, anticipating a large judgment on a community debt, used a

* Hon. George B. Nielsen, Jr., Bankruptcy Judge for the District of Arizona, sitting by designation.

marital settlement agreement ("MSA") in his pending divorce to shoulder the debt but strip himself of assets with which to pay the debt. Colluding with his spouse, he transferred his interest in $1 million of nonexempt funds in exchange for her interest in his $1.1 million exempt retirement fund.

Notwithstanding compelling evidence regarding intent, the court reasoned that such "planning" transfers can neither be avoided in bankruptcy, nor lead to denial of discharge.

We REVERSE as to both fraudulent transfer and denial of discharge. This is a paradigm case of actual intent to hinder, delay, or defraud creditors under the Uniform Fraudulent Transfer Act ("UFTA"). The California Supreme Court has held that MSA transfers may be avoided under UFTA. The same conduct leads to denial of discharge under 11 U.S.C. § 727(a)(2).

### FACTS

William Beverly, a lawyer, and his spouse executed an MSA on April 9, 2004, in a hostile divorce filed in August 2002.

The MSA was signed during a recess of a legal malpractice trial ("Outland litigation") in which Beverly told his spouse's attorney, Nancy Dunaetz, that he would lose up to $1 million and end up in bankruptcy.[1]

The community assets to be divided included Beverly's share of his law firm pension plan, which plan is ERISA-qualified and is exempt under California law. The Outland liability arose before 2002 and was conceded in the MSA to be community debt.

The MSA purported to divide and allocate all community property and debts. In addition to unexceptionable divisions of personal property, Beverly received the entire community property interest, worth about $1.1 million, in the exempt pension plan. He also received $100,000 for Outland litigation expenses (as a loan backed by a $135,000 deed of trust on property in escrow).

Beverly's spouse received: the entire community property interest in about $1 million from four nonexempt bank accounts, including proceeds from sale of the family home;[2] an Individual Retirement Account ("IRA") worth $100,000; the $135,000 deed of trust (as "equalizing payment" securing $35,000 for her attorneys' fees and $100,000 loaned to Beverly); miscellaneous personal property. She also would receive spousal support ($6,500/month after August 2004) and child support.

As to community debts under the MSA, Beverly undertook to pay the Outland litigation liability, together with tax liens and obligations attributable to him or to property he retained. His spouse assumed about $25,000 in credit card debt.

During MSA negotiations, Beverly proposed a "trade" in lieu of immediate distribution of proceeds when the sale of the family residence closed in March 2004. He would "trade" his share of more than $600,000 in proceeds for his spouse's share of the exempt pension plan.[3] The net result would be that he would be left with

---

1. Ltr. Beverly to Dunaetz, Apr. 9, 2004 ("It is very likely, if not probable, that I will be required to file bankruptcy within the next 30 to 60 days and perhaps close this office.").

2. The parties agree the bank accounts contained about $1 million. For simplicity, we refer to the sum as $1 million.

3. Ltr. Beverly to Dunaetz, Jan. 14, 2004 ("I want my half of the money distributed to me at the closing so I can *relocate* it. It makes no sense to close the deal and have the money 'held in escrow' as you previously demanded where it would make an easy target for the judgment creditor. Alternatively, I will trade all of my share of the house for a fair share of

only exempt or illiquid assets, while his spouse would receive all nonexempt liquid assets.

In the absence of agreement, a California court presumably would have divided community assets equally, the consequence of which would have been that each spouse would have had assets that included half of the exempt pension and more than $500,000 of cash each (of which $50,000 or $75,000 could have been rolled over into a new California exempt homestead).

Moving assets beyond the reach of the Outland creditors was explicitly part of the MSA negotiations as early as March 2003.[4]

On January 2, 2004, Beverly complained to Dunaetz that delays were eroding asset planning opportunities.[5] The concern gained urgency as the house sale loomed.[6] Dunaetz acknowledged the prospect of a judgment.[7] The risk was apparent to both spouses.[8]

When he executed the MSA, Beverly gave notice that the dire financial situation created for him by the MSA could lead to bankruptcy and to requesting spousal support for himself from the funds transferred to his spouse.[9]

On May 4, 2004, the Outland jury awarded $424,450 against Beverly person-

---

Stephanie's interest in the profit sharing plan. Assuming there is $650,000 in equity in the house (all 'after tax dollars') then I would trade my $325,000 residence equity for $500,000 in retirement plan interests (all 'pretax'). She would then take the entire $650,000 from the house and I would take just about the entire profit sharing plan."). [Emphasis in original.]

4. Ltr. Beverly to Dunaetz, Mar. 11, 2003 ("The amount that we expect to net, ..., is about $650,000.... I still have no malpractice insurance and am expecting service of the second complaint shortly. The house now becomes a very large asset for potential creditors of my business.").

5. Ltr. Beverly to Dunaetz, Jan. 2, 2004 ("Also enclosed is a copy of the order setting the trial in which there is no insurance for March 10, 2004. We have now lost any asset protection planning opportunity regarding which I recommended repeatedly. If Stephanie is required to satisfy a portion of the judgment[,] you can explain to her why you stalled until it was too late to do anything to protect her.").

6. Ltr. Beverly to Dunaetz, Jan. 14, 2004 ("The bad news is that we lost another round in the Outland case and the other side was awarded interim attorney fees of about $93,000. Our total exposure is now between $500,000 and $600,000 by my estimate. That is all of the equity in the Ardmore [family] house. What are you doing while Rome burns?").

7. Ltr. Dunaetz to Beverly, Jan. 15, 2004 ("[S]ubmit the Counter Offer [on the house

sale] on time, or you are going to risk losing the sale entirely, which could result in a huge charge against you if the equity in the house is thereafter loss [sic] to the anticipated Judgment against you.").

8. Ltr. Beverly to Dunaetz, Mar. 17, 2004 ("The trial starts next week. Things are getting progressively bleaker on that front.... The point of all that is that we better get this done this week or your client and I both stand to loose [sic] almost everything. The consensus is that we are looking at a judgment in the neighborhood of one million dollars.... [MSA counteroffer omitted] If we can not agree to this you can make your motion. I will be in trial fighting to save an estate for us to fight over. I actually will relax a little knowing that Stephanie will be paying for half of the judgment if we do not settle now.").

9. Ltr. Beverly to Dunaetz, Apr. 9, 2004 ("I want to be certain that there is no misunderstanding or miscommunication as we sit down to execute the [MSA]. Stephanie is receiving nearly $1,000,000 ... in cash and I am receiving only about $100,000 ... in cash. I have no net income so far this year.... It is very likely, if not probable, that I will be required to file bankruptcy within the next 30 to 60 days and perhaps close this office. If that occurs, I will also be making applications to modify the support and perhaps even seek support from the cash that Stephanie is receiving.").

ally (legal malpractice $289,350, breach of fiduciary duty $111,300, and constructive fraud $23,800), plus another $153,650 against two other defendants. The Outland judgment was entered on May 20, 2004. Beverly appealed.

The final divorce judgment, which incorporated the MSA, was entered on July 20, 2004. The record does not suggest that the state court was informed that the MSA left Beverly without assets from which to satisfy a $424,450 community debt assigned to him.

After Beverly told the judgment creditors he lacked assets to pay the judgment, they filed an involuntary chapter 7 case.

Relief was ordered on November 1, 2004, and Beverly was ordered to file schedules and statements by November 16, 2004.

·Beverly filed the schedules and statements on March 17, 2005, six days after the trustee and the Petitioning Creditors had objected to discharge on various 11 U.S.C. § 727(a) theories in two parallel adversary proceedings (Adv. Nos. 05–1254 and 05–1257). The creditors' action included nondischargeability counts under 11 U.S.C. §§ 523(a)(3) and (4).

Beverly exempted his $1,161,467.08 interest in the pension plan and claimed a $50,000 homestead exemption on a mobile home.

On June 14, 2005, the trustee sued Beverly and his former spouse to recover Beverly's share of the nonexempt funds transferred through the MSA, alleging counts under 11 U.S.C. §§ 544(b), 547, 548(b) and 550 (Adv. No. 05–1649).

The bankruptcy court consolidated the objections to discharge for trial, bifurcat-

ing (and later staying during this appeal) the creditors' § 523 nondischargeability counts.

Trial was held in three installments on the consolidated discharge objection adversary proceedings, which by then asserted counts under §§ 727(a)(2)(A), (a)(3), and (a)(6). The parties proceeded solely by declaration, deposition, and documentary evidence and chose not to present live testimony in open court.

The second and third installments of the discharge objection proceedings were combined with hearings on cross-motions for summary judgment in the trustee's avoiding action.

The court rendered oral findings of fact and conclusions of law, rejecting all three discharge denial theories.[10] As relevant to this appeal, it ruled that the MSA did not embody a fraudulent transfer for purposes of § 727(a)(2).

The court's basic line of analysis was that exemption planning is tolerated in bankruptcy, that the MSA embodied a transfer for reasonably equivalent value, and that there was no actual intent to defraud, hence there was no fraudulent transfer for purposes of § 727(a)(2). The trustee and the Outlands each appealed (BAP Nos. 06–1273 and 06–1284).

·The court disposed of the trustee's avoiding action (No. 05–1649) on cross-motions for summary judgment, reasoning that the protection given to MSAs and exemption planning also blocked exercise of the trustee's avoiding powers, including UFTA and § 548. The judgments entered seriatim in favor of each of the Beverlys, the first of which was accompanied by a Rule 54(b) certification, were appealed (BAP Nos. 06–1250 and 06–1449).

**10.** Although its findings are opaque because the court adopted parts of proposed findings that were not made part of the record, we are able to discern enough of the reasoning to enable review.

## JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. § 1334 over these core proceedings under 28 U.S.C. §§ 157(b)(2)(F), (H), and (J). We have jurisdiction under 28 U.S.C. § 158(a).

## ISSUES

(1) Whether the judgment in the consolidated discharge objection actions was final.

(2) Whether the MSA included a fraudulent transfer under California's UFTA.

(3) Whether the trial evidence warranted denial of discharge under § 727(a)(2)(A).

## STANDARD OF REVIEW

■ Whether orders are final relates to our jurisdiction, may be raised sua sponte, and is reviewed de novo. *Menk v. LaPaglia (In re Menk)*, 241 B.R. 896, 903 (9th Cir. BAP 1999).

■ We review summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party, to determine whether genuine issues of material fact remain for trial and which party is entitled to judgment as a matter of law. *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir.2001); *Miller v. Snavely (In re Snavely)*, 314 B.R. 808, 813 (9th Cir. BAP 2004).

■ In bankruptcy discharge appeals, we review findings of fact for clear error, conclusions of law de novo, and also apply de novo review to "mixed questions" of law and fact that require consideration of legal concepts and the exercise of judgment about the values that animate the legal principles. *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791–92 (9th Cir. 1997) (en banc), *overruling, e.g., Finalco, Inc. v. Roosevelt (In re Roosevelt)*, 87 F.3d 311, 314, *as amended*, 98 F.3d 1169 (9th Cir.1996) (§ 727 reviewed for abuse of discretion), and *Friedkin v. Sternberg (In re Sternberg)*, 85 F.3d 1400, 1404–05 (9th Cir. 1996) (same); *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir.1986) (§ 727 finding of transfer of property with intent to defraud is finding of fact).

■ Under the "clear error" standard, we accept findings of fact unless the findings leave the "definite and firm conviction that a mistake has been committed" by the trial judge. *Latman v. Burdette*, 366 F.3d 774, 781 (9th Cir.2004).

## DISCUSSION

After clarifying a basic civil procedure issue that affects appellate jurisdiction, we consider the application of California's UFTA in the context of an MSA intended to make a divorcing spouse "judgment proof." Then we address the § 727 discharge facet of the same conduct (BAP Nos. 1273 and 1284).

### I

■ The procedural issue involves finality in consolidated actions. The court consolidated the trustee's and the Outlands' adversary proceedings objecting to discharge under § 727 pursuant to Federal Rule of Civil Procedure 42(a) because there were common questions of law and fact. Fed.R.Civ.P. 42(a), *incorporated by* Fed. R. Bankr.P. 7042.

The choice to consolidate, instead of merely to hold the joint trial that Rule 42 also authorizes, had an unanticipated procedural consequence because the Outlands' adversary proceeding also alleged counts under § 523 challenging dischargeability of particular debts that remain unresolved.

The court bifurcated the Outlands' § 523 counts, as permitted by Rule 42(b), by

limiting the trial to the § 727 issues. Fed. R.Civ.P. 42(b). The court stayed the bifurcated § 523 claims pending this appeal but did not make a "Rule 54(b) certification" and direct entry of judgment when it overruled the objections to discharge. Fed.R.Civ.P. 54(b), *incorporated by* Fed. R. Bankr.P. 7054(a).

This left the problem that the "judgment" on the § 727 counts asserted by the trustee and the Outlands was, under Rule 54(b), interlocutory. A judgment as to fewer than all the claims or fewer than all the parties is not a "final judgment" unless the court makes an "express determination that there is no just reason for delay" and "an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). The requirement cannot be ignored: if there is no Rule 54(b) certification, then an order, even an order titled "judgment," does not end the action as to any claims or party and is subject to revision at any time before entry of the judgment that adjudicates all of the claims and the rights and liabilities of the parties. *Id.*

The Rule 42(b) bifurcation of the portion of the consolidated adversary proceedings that addressed § 523 nondischargeability does not excuse compliance with Rule 54(b).

■ In this circuit, a judgment in a consolidated action that does not resolve all claims against all parties is not appealable as a final judgment without a Rule 54(b) certification. *Huene v. United States*, 743 F.2d 703, 704–05 (9th Cir. 1984).[11]

As a result, the § 727 judgment rendered in the consolidated adversary proceedings is not a "final judgment" unless and until a Rule 54(b) certification is made, even though there would have been a "final judgment" as to the trustee's action if the Rule 42(a) alternative of joint trial had been employed instead of consolidation. Fed.R.Civ.P. 54(b); *Huene*, 743 F.2d at 705.

The status of an order as a "final judgment" has important, but different, ramifications for appellate jurisdiction at the two different levels of bankruptcy appeals. While jurisdiction over timely appeals from final judgments is automatic at both levels of appeal, courts of appeals ordinarily lack jurisdiction to review orders that are not final. *Huene*, 743 F.2d at 705.

■ In addition, bankruptcy appellate panels and district courts, but not courts of appeals, have broad discretionary authority to entertain interlocutory appeals from orders that are not final judgments. *Compare* 28 U.S.C. § 158(a), *with Id.* §§ 158(d) & 1292. Upon grant of leave to appeal, a bankruptcy appellate panel or district court may entertain an interlocutory appeal. 28 U.S.C. § 158(a)(3); Fed. R. Bankr.P. 8003.

The prescribed procedure to obtain leave to appeal under § 158(a)(3) is a Rule 8003 motion for leave to appeal, but the rule also confers discretion to regard an appeal improperly taken as a motion for leave to appeal. Fed. R. Bankr.P. 8003.

---

**11.** The circuits are divided three ways. *Huene*, 743 F.2d at 704–05; *accord, Trinity Broad. Corp. v. Eller*, 827 F.2d 673, 675 (10th Cir.1987); *cf. Road Sprinkler Fitters Local Union v. Cont'l Sprinkler Co.*, 967 F.2d 145, 148–50 (5th Cir.1992) (depends on nature of consolidation); *Bergman v. City of Atlantic City*, 860 F.2d 560, 564 (3d Cir.1988) (same); *Hageman v. City Investing Co.*, 851 F.2d 69, 71 (2d Cir.1988) (same); *Sandwiches, Inc. v. Wendy's Int'l, Inc.*, 822 F.2d 707, 709 (7th Cir.1987); *contra, FDIC v. Caledonia Inv. Corp.*, 862 F.2d 378, 380–81 (1st Cir.1988); *Kraft, Inc. v. Local Union 327, Teamsters*, 683 F.2d 131, 133 (6th Cir.1982); *see generally* Jacqueline Gerson, Comment, *The Appealability of Partial Judgments in Consolidated Cases*, 57 U. CHI. L.REV. 169, 178–91 (1990).

■ Having exercised our discretion to treat the notice of appeal improperly taken (because the order being appealed is not final) as a motion for leave to appeal and having granted leave to appeal the interlocutory judgment, we have appellate jurisdiction over the § 727 appeals by virtue of § 158(a)(3), notwithstanding the absence of a Rule 54(b) certification.

## II

The key question in the trustee's avoiding action appeals (BAP Nos. 06–1250 and 06–1449) is whether it was error to rule that the MSA does not embody an actually fraudulent transfer under California's UFTA, which applies in bankruptcy by way of § 544(b). Cal. Civ.Code § 3439.04(a)(1).

As there were cross motions for summary judgment, we look for genuine issues of material fact and, if none, determine which moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), *incorporated by* Fed. R. Bankr.P. 7056.

### A

Section 544(b) confers on bankruptcy trustees the power to avoid any transfer of an interest of the debtor in property that is voidable under nonbankruptcy law by a creditor holding an allowable unsecured claim. 11 U.S.C. § 544(b).[12]

If a transfer is avoidable under nonbankruptcy law, then it is avoided unless the Bankruptcy Code provides otherwise. The statutory exceptions relate to charitable contributions and certain payments and agreements in the finance industry. 11 U.S.C. §§ 544(b)(2)[13] & 546(e)-(g) & (j).

The consequences of avoidance are set forth at § 550 ("Liability of transferee of avoided transfer"). Congress explicitly separated the concepts of avoiding a transfer and recovering from a transferee. *Lippi v. City Bank,* 955 F.2d 599, 605 (9th Cir.1992); *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen),* 199 B.R. 709, 718 (9th Cir. BAP 1996) ("*Cohen*").

### B

The Outland judgment creditors satisfy the § 544(b) requirement that there be a creditor holding an unsecured claim that is allowable under § 502.

California's UFTA is the relevant § 544(b) "applicable law" that the Outland judgment creditors could invoke in the absence of bankruptcy. Cal. Civ.Code § 3439.01 *et seq.*

Whether a transfer is avoidable under California's UFTA is a question purely of California law as to which the California Supreme Court is the final authority. Thus, a federal court construing UFTA is merely predicting what the state supreme court would rule if presented with the question. *Comm'r v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

**12.** Section 544(b) provides, in pertinent part:
(b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
11 U.S.C. § 544(b)(1).

**13.** Section 544(b)(2) provides:

(b)(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.
11 U.S.C. § 544(b)(2).

■ The § 544(b) requirement of a transfer of "an interest of the debtor in property," which is a phrase common to §§ 544(b), 547, and 548, refers to property that would have been part of the estate had it not been transferred before bankruptcy. *See Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *Keller v. Keller (In re Keller),* 185 B.R. 796, 799 (9th Cir. BAP 1995). In other words, the focus is on the interest of the debtor that was transferred.

■ As pertinent here, the "interest of the debtor in property" is Beverly's transfer to his spouse of his half of the unencumbered $1 million in bank deposits. This is a transfer. It is not an equal division of bank deposits that would have had the effect of confirming to Beverly the interest that he already had. Here, Beverly was entitled to the one-half of the funds that he transferred.

Nor does the community property origin of the debtor's transferred interest in property make a difference. Nobody disputes the effectiveness of the state court's decree dividing the community property pursuant to the MSA to transform all property from community to separate property status before the Beverly involuntary bankruptcy was filed. *See Gendreau v. Gendreau (In re Gendreau),* 191 B.R. 798, 803 (9th Cir. BAP 1996).

The issue, rather, is whether the prebankruptcy transfer of the debtor's interest in $1 million can be avoided under UFTA. If so, then the transferred property would be recoverable for the benefit of creditors cheated by the MSA that did something other than evenly dividing divisible property. The trustee does not attack the MSA or the order approving it. To be sure, a win by the trustee may precipitate revision of the property division among the former spouses, but that does not affect avoidance.

### C

■ It is settled California law that a transfer accomplished through an MSA can be avoided as a fraudulent transfer pursuant to UFTA. *Mejia v. Reed,* 31 Cal.4th 657, 3 Cal.Rptr.3d 390, 74 P.3d 166, 173–74 (2003) ("UFTA applies to property transfers under MSA's [sic]").

In *Mejia,* the California Supreme Court harmonized UFTA with the provision of California Family Code § 916 that insulates a spouse, and property received on dissolution, from involuntary liability for the other spouse's debt.[14]

■ The state supreme court noted it is California legislative policy that, in allocating debts to divorcing parties, account be taken of the rights of creditors "so there will be available sufficient property to satisfy the debt by the person to whom the debt is assigned." *Mejia,* 3 Cal. Rptr.3d 390, 74 P.3d at 171, *quoting Lezine v. Sec. Pac. Fin. Servs., Inc.,* 14 Cal.4th 56, 58 Cal.Rptr.2d 76, 925 P.2d 1002, 1013 (1996).

■ Moreover, it is also California legislative policy that creditors be protected from fraudulent transfers, including transfers between spouses. Accordingly,

---

14. The pertinent provision is:

    (2) The separate property owned by a married person at the time of the division [of community and quasi-community property] and the property received by the person in the division is not liable for a debt incurred by the person's spouse before or during marriage, and the person is not personally liable for the debt, unless the debt was assigned for payment by the person in the division of the property. Nothing in this paragraph affects the liability of property for the satisfaction of a lien on the property.

Cal. Fam.Code § 916(a)(2).

transfers before and after dissolution can be avoided as fraudulent transfers. *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 173. When a court divides marital property in the absence of agreement by the parties, it must divide the property equally, but an MSA need not be equal. *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 173.

■ From these considerations, the California Supreme Court concluded that divorcing couples do not have "a one-time-only opportunity to defraud creditors by including the fraudulent transfer in an MSA." *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 173. Hence, it ruled that Family Code § 916 does not trump UFTA.

The state supreme court also noted that the majority of other UFTA jurisdictions that had considered the question had construed UFTA to apply to marital property transfers. *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 170 (citing cases). It regarded these decisions as informing its analysis. UFTA provides it "shall be applied and construed to effectuate its general purpose to make uniform the law ... among states enacting it." *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 171 (ellipsis in original), *quoting* Cal. Civ.Code § 3439.11.

Finally, the state supreme court noted that there are other California theories, as well as federal theories, for setting aside MSAs on account of fraud. It specifically noted its expectation that a bankruptcy trustee could "set aside the property division of a dissolution judgment on the ground of fraud." *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 174, *citing Britt v. Damson*, 334 F.2d 896, 902 (9th Cir.1964); and *Webster v. Hope (In re Hope)*, 231 B.R. 403, 415 & n. 19 (Bankr.D.D.C.1999) (cataloging cases).

■ In the end, the supreme court concluded that "while the law respects the finality of a property settlement agree-ment 'that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties,' we find no legislative policy to protect such agreements from attack as instruments of fraud." *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 174, *quoting Adams v. Adams*, 29 Cal.2d 621, 177 P.2d 265, 267 (1947). In other words, while there is no requirement that a California MSA divide property equally, an MSA cannot divide property in a manner fraudulent to creditors.

Thus, the California Supreme Court held, as a matter of California law, that "UFTA applies to property transfers under MSA's [sic]." *Mejia*, 3 Cal.Rptr.3d 390, 74 P.3d at 174. It follows that the Beverly MSA is vulnerable to scrutiny under UFTA.

In entering the judgments against the trustee, the bankruptcy court discounted *Mejia*, saying it did not "really decide anything" and, inexplicably conflating § 544(a) with § 544(b), ruled that the trustee had no rights as a hypothetical lien creditor. The court did not grapple with the implications of the holding that UFTA applies to MSAs under California law.

This was error. *Mejia* decided a great deal. The California Supreme Court established that, as a matter of California law, an MSA may be attacked as a California fraudulent transfer under UFTA and disapproved contrary California intermediate appellate authority. *Mejia*, 3 Cal. Rptr.3d 390, 74 P.3d at 174 n. 2, *disapproving Gagan v. Gouyd*, 73 Cal.App.4th 835, 86 Cal.Rptr.2d 733 (1999). This definitive determination of California law cannot be brushed aside in federal litigation in which California law provides the rule of decision.

The error was compounded by the court's focus on whether the trustee was a hypothetical lien creditor for purposes of the conceptually distinct "strong arm"

power under § 544(a) that is used to defeat imperfectly perfected liens. Hypothetical lien creditor status is irrelevant to the nonbankruptcy avoiding powers that are incorporated by § 544(b). There is nothing hypothetical about the Outland judgment creditors and their eligibility to serve as the basis for a § 544(b) avoiding action.

In sum, the trustee had the ability to attack the transfer by way of MSA of Beverly's interest in the nonexempt $1 million.

**D**

The question becomes whether the transfer is avoidable under California's UFTA as an actually fraudulent transfer.

**1**

Actually fraudulent transfers are avoidable under UFTA by present and future creditors. A transfer is said to be "actually fraudulent" as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ.Code § 3439.04(a)(1).[15]

■ The focus is on the intent of the transferor. While intent to defraud is the usual rubric, the intended effect of the transfer need only be hindrance of a creditor or delay of a creditor. Any of the three—intent to hinder, intent to delay, or intent to defraud—qualifies a transfer for UFTA avoidance, even if adequate consideration is paid by someone other than a good faith transferee for reasonably equivalent value. Cohen, 199 B.R. at 716–17 (California UFTA).

■ Whether there is actual intent to hinder, delay, or defraud under UFTA is a question of fact to be determined by a preponderance of evidence. Bulmash v. Davis, 24 Cal.3d 691, 157 Cal.Rptr. 66, 597 P.2d 469, 473 (1979); Filip v. Bucurenciu, 129 Cal.App.4th 825, 28 Cal.Rptr.3d 884, 890 (2005); Annod Corp. v. Hamilton & Samuels, 100 Cal.App.4th 1286, 123 Cal. Rptr.2d 924, 929 (2002).

■ Since direct evidence of intent to hinder, delay or defraud is uncommon, the determination typically is made inferentially from circumstances consistent with the requisite intent. Filip, 28 Cal.Rptr.3d at 890. Thus, UFTA lists eleven nonexclusive factors that historically (since the Statute of 13 Elizabeth in 1572) have been regarded as circumstantial "badges of fraud" that are probative of intent. Cal. Civ.Code § 3439.04(b).[16]

**15.** Section 4 of UFTA, as enacted in California provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Cal. Civ.Code § 3439.04(a)(1) (UFTA § 4(a)(1)).

**16.** The statutory list is:

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

The UFTA list of "badges of fraud" provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of "badges of fraud." *Filip*, 28 Cal.Rptr.3d at 890; *Annod Corp.*, 123 Cal.Rptr.2d at 932–33.

### 2

The summary judgment evidence in this appeal contains an extraordinary amount of direct evidence of the requisite intent, as well as circumstantial evidence of "badges of fraud."

#### a

The direct evidence in the debtor's own words in letters to his spouse's counsel, Nancy Dunaetz, is remarkably candid:

> ... I still have no malpractice insurance and am expecting service of the second complaint shortly. The house now becomes a very large asset for potential creditors of my business. (Mar. 11, 2003).

* * *

> We have now lost any asset protection planning opportunity regarding which I recommended repeatedly. If Stephanie is required to satisfy a portion of the judgment[,] you can explain to her why you stalled until it was too late to do anything to protect her. (Jan. 2, 2004).

* * *

> I want my half of the money distributed to me at the closing so I can *relocate* it. It makes no sense to close the deal and have the money 'held in escrow' as you previously demanded where it would make an easy target for the judgment creditor. (Jan. 14, 2004) (Emphasis in original).

* * *

> I will trade all of my share of the house for a fair share of Stephanie's interest in the profit sharing plan. Assuming there is $650,000 in equity in the house (all 'after tax dollars') then I would trade my $325,000 residence equity for $500,000 in retirement plan interests (all 'pre-tax'). She would then take the entire $650,000 from the house and I would take just about the entire profit sharing plan. (Jan. 14, 2004).

* * *

> Our total [Outland litigation] exposure is now between $500,000 and $600,000 by my estimate. That is all of the equity in the [family] house. What are you doing while Rome burns? (Jan. 14, 2004).

---

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ.Code § 3439.04(b). California did not codify the "badges of fraud" in UFTA § 4 until January 1, 2005. *Filip*, 28 Cal.Rptr.3d at 890; S.B. 1408, 2003–04 Reg. Sess., Sen. Rules Comm. Bill Analysis (Cal. Apr. 15, 2004) ("This bill is sponsored by the Business Law Section of the California State Bar.").

\* \* \*

A big issue will be the practice which you value at $150,000. At the moment[,] I value it at a negative $500,000 due to the Outland–Maupin liability which will be at least $250,000 and possibly $500,000 and other issues. Stephanie must share in the obligation. She can not take the assets generated by my business and not share in the exposure. . . . I am anxious to do this as soon as possible because of the imminent trial. I need to do some planning. (Jan. 24, 2004).

\* \* \*

If you want to hold the [house sale proceeds] in a joint account, I can not agree because that is the same as giving the money away. If you run to court and get such an order you are setting Stephanie up to lose the entire amount. (Jan. 28, 2004).

\* \* \*

I suggest we each take $100,000 now and make it disappear as fast as we can for the same reason. Pay debts etc. now. I am fully expecting that bankruptcy will be my only option six months from now. (Jan. 28, 2004).

\* \* \*

The trial starts next week. . . . [W]e better get this done this week or your client and I both stand to lose almost everything. The consensus is that we are looking at a judgment in the neighborhood of one million dollars. . . . I actually will relax a little knowing that Stephanie will be paying for half of the judgment if we do not settle now. (Mar. 17, 2004).

\* \* \*

Stephanie is receiving nearly $1,000,000 . . . in cash[,] and I am receiving only about $100,000 . . . in cash. I have no net income so far this year. . . . It is very likely, if not probable, that I will be required to file bankruptcy within the next 30 to 60 days and perhaps close this office. If that occurs, I will also be making applications to modify the support and perhaps even seek support from the cash that Stephanie is receiving. (Apr. 9, 2004).

These statements are properly part of the summary judgment evidence because they were proffered by the trustee as affidavit exhibits and, in the words of Rule 56(e), "would be admissible in evidence." Fed.R.Civ.P. 56(e), *incorporated by* Fed. R. Bankr.P. 7056. Specifically, Beverly's own statements, when offered against him, are admissions that are not hearsay. Fed. R.Evid. 801(d)(2). It was established that during depositions Beverly authenticated the letters containing these statements.

The evidence demonstrates that the Outland litigation was the main reason Beverly structured the MSA so as to transfer his entire interest in the $1 million nonexempt fund. If there had been a simple equal division of community assets (as presumed by California law when a court makes the division), he would have had about $500,000 of nonexempt funds ($50,000 eligible to be rolled over into a new homestead) that he knew would be vulnerable to collection of the $424,000 Outland judgment.

b

The circumstantial evidence consists of a number of the statutory "badges of fraud."

First, the transfer to Mrs. Beverly was a transfer to an insider. Cal. Civ.Code § 3439.04(b)(1).

Second, the transfer was made after Beverly had been sued in the Outland litigation. Cal. Civ.Code § 3439.04(b)(4).

Third, the transfer was of substantially all of Beverly's assets. Cal. Civ.Code § 3439.04(b)(5). His retention of his interest in the exempt retirement plan does not count because exempt property is not an UFTA "asset."

UFTA's definition of "asset" excludes exempt property. Cal. Civ.Code § 3439.01(a).[17] Thus, although Beverly retained his interest in the exempt retirement plan (and received his spouse's interest), that value counts as zero in calculating whether the transfer was of substantially all of Beverly's assets for purposes of UFTA badge-of-fraud analysis.

Fourth, the MSA transfer rendered Beverly insolvent. Cal. Civ.Code § 3439.04(b)(9).

As to insolvency, the exclusion of exempt property from UFTA's definition of "asset" is crucial. UFTA defines insolvency as the sum of debts being greater than all the assets. Cal. Civ.Code § 3439.02(a).[18] Before the MSA transfer, Beverly's UFTA assets included $500,000 in nonexempt bank deposits, and his debts included the $424,450 judgment. After the MSA transfer, his only UFTA assets were of nominal value, but his debts remained

the same. Thus, if Beverly was not already insolvent, the MSA transfer made him insolvent for UFTA purposes.

Fifth, the transfer occurred shortly after a substantial debt was incurred. Cal. Civ. Code § 3439.04(b)(10). The MSA transfer was agreed upon in the midst of trial that led to a $424,450 judgment and was incorporated in the marital dissolution decree shortly after the money judgment was entered.

### 3

The cumulative effect of the trustee's direct and circumstantial summary judgment evidence that is probative of intent to hinder, delay, or defraud creditors is powerful.

Beverly's summary judgment evidence in opposition makes two basic points in the nature of confession and avoidance. First, he subjectively believed that his "planning" transfers could not be avoided. In support, he asserts that a bankruptcy lawyer with offices in the same building told him that the transfers were permissible and that a commentary in a legal newspaper regarding an appellate decision also supported his view. Second, he contends that the MSA negotiations were not collusive because the divorce was hostile and was resolved through mediation.

---

17. "Asset" is defined in UFTA as:

(a) "Asset" means property of a debtor, but the term does not include, the following:
(1) Property to the extent it is encumbered by a valid lien.
(2) Property to the extent it is generally exempt under nonbankruptcy law.
Cal. Civ.Code § 3439.01(a).

18. Insolvency is defined in UFTA as:

(a) A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.
. . .

(d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.
Cal. Civ.Code § 3439.02.

The Bankruptcy Code reaches the same result by defining "insolvent" to exclude exempt property from the asset side of the balance sheet. 11 U.S.C. § 101(32)(A)(ii).

Beverly's summary judgment evidence is not of a quality to raise a *genuine* issue of material fact in the face of the trustee's powerful evidence. His (imperfect) understanding of bankruptcy law is beside the point. The crucial question was whether the MSA transfer could be avoided as a matter of *California* law. The Bankruptcy Code does not generally preempt state-law avoiding powers. Regardless of bankruptcy, Beverly always faced the need to run the UFTA gauntlet. Even cursory research would have turned up the California Supreme Court's *Mejia* decision, which squarely exposes MSA transfers to UFTA avoidance. As to the MSA negotiations, both spouses had an incentive to thwart collection of the Outland judgment. Nor is there any evidence regarding the extent to which the mediator was apprised of the UFTA issues that would be triggered by the MSA.

On balance, there is no genuine issue of material fact as to any of the essential elements of avoidance under UFTA.

4

As a defense to avoidance, Mrs. Beverly contends that she was a good faith transferee for reasonably equivalent value.

Unlike Bankruptcy Code § 548, UFTA protects good faith transferees from avoidance of fraudulent transfers based on actual intent to hinder, delay, or defraud creditors so long as the good faith transferee also gave reasonably equivalent value. Cal. Civ.Code § 3439.08(a); *Filip*, 28 Cal. Rptr.3d at 887–92. And, good faith transferees of all other UFTA fraudulent transfers have a lien to the extent of value given to the debtor. Cal. Civ.Code § 3439.08(d).

In contrast, § 548 does not provide a good faith transferee defense to avoidance for any category of fraudulent transfer, but does grant a good faith transferee for value whose transfer is avoided a lien to

the extent of value given. 11 U.S.C. § 548(c).

■ As it is a matter of defense and not an essential element of avoidance, the proponent of good faith transferee status has the burden of proof. *Cohen*, 199 B.R. at 718–19.

■ The summary judgment evidence belies Mrs. Beverly's contention that she is a good faith transferee. All of the correspondence that contains direct evidence of Beverly's actually fraudulent intent was directed to Mrs. Beverly's counsel, who was her agent for those purposes. Moreover, copies of many of the letters were also directed to Mrs. Beverly.

That Beverly's message registered with Mrs. Beverly and her counsel is apparent from a letter from Mrs. Beverly's counsel:

[S]ubmit the Counter Offer [on the house sale] on time, or you are going to risk losing the sale entirely, which could result in a huge charge against you if the equity in the house is thereafter loss [sic] to the anticipated Judgment against you. (Jan. 15, 2004).

The statement in this letter, which is presented by the trustee's summary judgment affidavits, likewise meets the Rule 56(e) "would be admissible" standard. It is a statement offered against a party made by a person (her lawyer) authorized to make a statement concerning the subject and also constitutes a statement by the party's agent (her lawyer) concerning a matter within the scope of the agency made during the existence of the relationship. Fed.R.Evid. 801(d)(2)(C) & (D).

In short, the proponent of good faith transferee status has not produced enough to demonstrate the existence of a genuine issue of material fact that would support such a finding.

It follows that the MSA transfer was an actually fraudulent transfer under UFTA not subject to the good-faith-transferee-for-reasonably-equivalent-value defense and may be avoided.

### E

The Ninth Circuit decision in *Gill v. Stern (In re Stern)*, 345 F.3d 1036 (9th Cir.2003) ("*Stern*"), which affirmed a summary judgment that a pension plan was exempt and was not funded by an UFTA fraudulent transfer, does not compel a different result.

Although there was an MSA in the background of *Stern* in which the debtor's interest in nonexempt property was transferred to the former spouse, that transfer was not challenged. Rather, *Stern* was an attempt by the trustee to obtain control over an exempt retirement plan.

The Ninth Circuit faced only two questions in *Stern* that pertain to the Beverly appeal: first, whether the pension plan was exempt under California law; and, second, whether the transfer of IRA funds into the pension plan was avoidable as an actual intent UFTA fraudulent transfer. *Stern*, 345 F.3d at 1040.

▮ Although *Stern* is obscure on the point, the transfer that survived the UFTA challenge was a transfer from one form of exempt asset to another form of exempt asset. Transfers from one form of exemption to another are commonly protected, even if proceeds pass through a nonexempt account. *Cf. Love v. Menick*, 341 F.2d 680, 681–82 (9th Cir.1965) (from life insurance to savings and loan account).

The conclusion that the pension plan in *Stern* was fully exempt necessarily means that it passed muster under the California statutory requirement that it be "designed and used for retirement purposes." Cal. Civ.Proc.Code § 704.115(a)(2); *Bloom v. Robinson (In re Bloom)*, 839 F.2d 1376, 1378 (9th Cir.1988); *Daniel v. Sec. Pac. Nat'l Bank (In re Daniel)*, 771 F.2d 1352, 1358 (9th Cir.1985).

The IRA whence the transfer was made was also exempt, in whole or in part. The funds in the IRA had been rolled over from a tax-qualified defined benefit pension plan. *Stern*, 345 F.3d at 1039. In California, an IRA is exempt as a "private retirement plan," to the extent necessary to provide for support upon retirement, if it is designed and used principally for retirement purposes. Cal.Civ.Proc.Code §§ 704.115(a)(3) & (e); [19] *Dudley v. Anderson (In re Dudley)*, 249 F.3d 1170, 1176 (9th Cir.2001). Thus, while we do not know whether all of the IRA was exempt,

---

**19.** The version of § 704.115(a)(3) in effect in 1992 was:

(a) As used in this section, "private retirement plan" means:

. . .

(3) Self-employed retirement plans and individual retirement annuities or accounts provided for in the Internal Revenue Code of 1954 as amended, to the extent the amounts held in the plans, annuities, or accounts do not exceed the maximum amounts exempt from federal income taxation under that code.

Cal.Civ.Proc.Code § 704.115(a)(3) (West Supp.1992). A 1999 amendment substituted "1986" for "1954" and added the clause: "including individual retirement accounts qualified under Section 408 or 408A of that code." *Id.* (West Supp.2000).

Subsection (e) provides, in relevant part: (e) . . . [T]he amounts described in [§ 704.115(a)(3) ] are exempt only to the extent necessary to provide for the support of the judgment debtor when the judgment debtor retires and for the support of the spouse and dependents of the judgment debtor, taking into account all resources that are likely to be available for the support of the judgment debtor when the judgment debtor retires.

Cal.Civ.Proc.Code § 704.115(e) (West 1987 & Supp.2000).

*Stern* is not a simple instance of eve-of-bankruptcy exemption planning.

As to UFTA, the *Stern* ruling was that, in the absence of any direct evidence regarding intent, the circumstantial evidence of repositioning assets from a (fully or partially) exempt IRA to an exempt pension plan before filing a short-lived chapter 11 that apparently was prompted by the earlier arbitration award was "unspectacular" and inadequate, standing alone, to support a finding of actual intent to hinder, delay, or defraud creditors. *Stern*, 345 F.3d at 1045.

As *Stern* was fact-intensive, the relevant chronology is important to understanding it:

1989 Stern terminates qualified, defined benefit pension plan and transfers assets to IRA;

4/92 Stern creates corporate pension plan;

9/92 $4.6 million arbitration award against Stern;

10/92 Stipulated divorce and MSA—former spouse retains nonexempt $2 million, while Stern assumes arbitration liability, retains corporation, and retains $1.4 million IRA;

10/92 Stern transfers IRA assets to 4/92 pension plan;

11/92 Stern files chapter 11 case;

12/92 Stern obtains dismissal of chapter 11 case because he does not agree to appointment of chapter 11 trustee to operate his business;

7/93 State-court UFTA action to avoid $1.4 million transfer from IRA to profit sharing pension plan;

8/95 Stern files chapter 7 case;

6/96 Trustee intervenes as plaintiff in UFTA action removed to bankruptcy court from state court.

Against this background, *Stern* materially differs from the present case. It was not an MSA fraudulent transfer decision—the MSA transfer was not challenged. Nor did the challenged transfer involve an entirely nonexempt asset; rather, it was a transfer of an exempt IRA to an exempt pension plan. Nor was there direct evidence probative of intent. The circumstantial evidence was little more than the timing of the questioned transfer before filing a short-lived chapter 11 case. Finally, *Stern* was atypical because the debtor waited thirty-three months to file a chapter 7. The chapter 11 filing and its voluntary dismissal suggested there was intent to deal with the creditors.

Beverly reads too much into *Stern's* dicta. To be sure, the *Stern* panel was influenced by settled law that mere conversion by a consumer of nonexempt into exempt property on the eve of bankruptcy does not, without more, disentitle a debtor to an exemption. *Wudrick v. Clements*, 451 F.2d 988, 989–90 (9th Cir.1971), *cited with approval*, *Stern*, 345 F.3d at 1043–44. Despite its references to precedent, *Stern's* invocation of federal exemption doctrine from *Wudrick* was merely an analogy used to help explain why, under California law, the circumstantial evidence was too weak to establish a genuine issue of material fact suggesting that the IRA transfer was animated by actual intent to hinder, delay, or defraud creditors.

Several factors counsel against construing *Stern* as exporting substantive federal bankruptcy exemption planning doctrine from *Wudrick* to nonbankruptcy UFTA law. First, expanding *Wudrick* exemption planning law to apply to fraudulent transfers of property of proportions greater than the scope of traditional individual bankruptcy exemptions would place the Ninth Circuit in conflict with four other circuits. *Smiley v. First Nat'l Bank (In*

*re Smiley)*, 864 F.2d 562, 568 (7th Cir. 1989) (intent to hinder or delay); *Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871, 874–76 (8th Cir.1988) (debtor "did not want a mere *fresh* start, he wanted a *head* start"); *Ford v. Poston (In re Ford)*, 773 F.2d 52, 55 (4th Cir.1985); *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 990–92 (5th Cir.1983). We doubt that the Ninth Circuit would have stepped out of the mainstream without being deliberate about doing so.

Nor is there a hint that *Stern* purported to construe UFTA in a manner inconsistent with California law. *Wudrick* states federal law regarding allowability of exemptions in bankruptcy. UFTA is a matter of California statute. It would be extraordinary for federal decisional law regarding exemptions to be binding on a different general question of California law, especially in the face of the California Supreme Court decision that MSA transfers may be avoided as UFTA fraudulent transfers.

It follows that *Stern* should be understood as an elementary summary judgment decision in which the constellation of facts did not yield a genuine issue of material fact. The requirement of summary judgment is that there be a *genuine* issue, not merely an issue, of material fact. There was no *genuine* issue in *Stern*.

Beverly is at the opposite end of the spectrum. There is overwhelming direct evidence of his intent to hinder, delay, or defraud creditors. Circumstantial evidence, other than evidence regarding the timing of the transfer, corroborates the direct evidence. Hence, *Stern* does not undermine the conclusion that Beverly actually intended to hinder, delay, or defraud creditors.

### III

In the objection-to-discharge appeals (BAP Nos. 06–1273 and 06–1284), the ap-

pellants challenge the ruling that Beverly did not transfer property with "intent to hinder, delay, or defraud" a creditor or the trustee for purposes of § 727(a)(2).

The bankruptcy court's line of analysis was that tolerance of basic bankruptcy exemption planning, the protection afforded to MSAs under California law, and the relatively equal value in the Beverly MSA all negate § 727(a)(2) intent to hinder, delay, or defraud creditors. None of these reasons, however, suffice to overcome the overwhelming evidence of Beverly's intent vis-à-vis the Outland litigation.

### A

First, the statute. Under § 727(a)(2)(A), a discharge may be denied if it is demonstrated that:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A).

Since the Beverly MSA transfer unambiguously occurred within one year before the filing of the petition, the question is whether the transfer of Beverly's interest in $1 million of nonexempt property was accompanied by "intent to hinder, delay, or defraud" the Outland creditors. 11 U.S.C. § 727(a)(2)(A).

The commonality between the fraudulent transfer avoiding power and denial-of-discharge provisions is the requirement of "intent to hinder, delay, or defraud" creditors. 11 U.S.C. §§ 548(a)(1)(A) & 727(a)(2); Cal. Civ.Code § 3439.04(a)(1).

█ As the requirement is stated in the disjunctive, it suffices to demonstrate any of the three alternatives, intent either

to hinder *or* to delay *or* to defraud creditors. *Adeeb,* 787 F.2d at 1343 ("debtor who knowingly acts to hinder or delay his creditors acts with the very intent penalized by [§ 727(a)(2) ]"); *Devers v. Bank of Sheridan (In re Devers),* 759 F.2d 751, 753 (9th Cir.1985); *Searles v. Riley (In re Searles),* 317 B.R. 368, 379 (9th Cir. BAP 2004), *aff'd,* 212 Fed.Appx. 589 (9th Cir. 2006). In other words, proof of mere intent to hinder or to delay may lead to denial of discharge. *Id.*

In view of the three alternatives, generic descriptive phrases such as "fraudulent transfer," "fraudulent intent," and "actual fraudulent intent" are misleadingly imprecise generalizations to the extent that, in addition to fraud, they subsume adequate independent grounds of mere hindrance and delay.

In theory, the "intent" requirement differs as between denial of discharge under § 727(a)(2) and avoidable fraudulent transfers under § 548(a)(1) and UFTA. Mere *intent* to hinder, delay, or defraud a creditor is all that is needed to deny discharge under § 727(a)(2)(A). In contrast, for a transfer to be avoided under § 548(a)(1)(A) and UFTA, there must be proof of *actual intent* to hinder, delay, or defraud.

In practice, however, there may be little difference between *"intent* to hinder, delay, or defraud" and *"actual intent* to hinder, delay, or defraud." In § 727(a)(2) cases, the Ninth Circuit has used "intent" and "actual intent" interchangeably. *Emmett Valley Assocs. v. Woodfield (In re Woodfield),* 978 F.2d 516, 518 (9th Cir. 1992); *Adeeb,* 787 F.2d at 1342.

▮ Whether a debtor harbors intent to hinder, or delay, or defraud a creditor is a question of fact reviewed for clear error. *Woodfield,* 978 F.2d at 518; *Searles,* 317 B.R. at 379; *cf. Bammer,* 131 F.3d at 791 (distinguishing among standards).

▮ Intent may be inferred from surrounding circumstances. *Woodfield,* 978 F.2d at 518; *Adeeb,* 787 F.2d at 1342–43. The surrounding circumstances include the various "badges of fraud" that constitute circumstantial evidence of intent. *Woodfield,* 978 F.2d at 518. A course of conduct may also be probative of the question of intent. *Adeeb,* 787 F.2d at 1343; *Devers,* 759 F.2d at 753–54; *Searles,* 317 B.R. at 380.

▮ The burden of proof on an objection to discharge under § 727(a)(2) is preponderance of evidence. *See Grogan v. Garner,* 498 U.S. 279, 289, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Lansdowne v. Cox (In re Cox),* 41 F.3d 1294, 1297 (9th Cir. 1994); *Searles,* 317 B.R. at 376; 6 Collier on Bankruptcy ¶ 522.08[4] (Henry J. Sommer & Alan N. Resnick eds. 15th ed. rev. 2006) ("Collier 15th ed.").

▮ As applied to Beverly's MSA transfer of his interest in $1 million of nonexempt property to his former spouse, the evidence of Beverly's intent to hinder, delay, or defraud the Outland creditors is so overwhelming for the reasons we previously have described with respect to UFTA that the contrary conclusion was clear error.

**B**

▮ The avoidance of a fraudulent transfer under § 548 or UFTA does not necessarily compel the denial of discharge even though the issue of "intent to hinder, delay, or defraud" creditors may have been resolved in fraudulent transfer litigation.

For example, a transfer avoidable as constructively fraudulent does not qualify for denial of discharge. *Compare* 11 U.S.C. § 548(a)(1)(B), *with Id.* § 727(a)(2).

Time periods may differ. Denial of discharge requires that the offending transfer normally[20] occur within one year before bankruptcy, while avoiding periods may be longer. *Compare, e.g.,* Cal. Civ.Code § 3439.09(a) (4 years), *with* 11 U.S.C. § 548(a)(1) (2 years after 2005) *and id.* § 727(a)(2) (1 year).

The most difficult problems arise when there is a conversion of nonexempt to exempt property. Such a transfer, by definition, cannot be for reasonably equivalent value because both UFTA and Bankruptcy Code exclude exempt property when assessing insolvency for fraudulent transfer purposes. 11 U.S.C. § 101(32); Cal. Civ. Code § 3439.01(a)(2). Thus, the question boils down to whether there is intent to hinder, or to delay, or to defraud creditors.

### C

The exemption planning aspect of the situation does not compel a different result. Based on the overall MSA transaction, the bankruptcy court reasoned that the toleration of bankruptcy exemption planning means that discharge cannot be denied because there cannot be intent to hinder, delay, or defraud creditors. This overstates the effect of exemption planning.

### 1

■ Under the Bankruptcy Act of 1898, exemptions could be rejected on equitable principles if the act of placing the property into exempt status entailed fraud. *E.g., Miguel v. Walsh,* 447 F.2d 724, 726 (9th Cir.1971); *Freedman Bros. Co. v. Parker (In re Gerber),* 186 F. 693, 696–97 (9th Cir.1911); 1A James Wm. Moore, Collier on Bankruptcy ¶ 6.11[3] (Lawrence P.

King, ed., 14th ed. 1978) ("COLLIER 14th ed.") (collecting cases).

But the mere fact of the timing of the conversion on the eve of bankruptcy, without additional evidence probative of fraud, was insufficient to support rejection of an exemption as having been obtained by fraud. *E.g., Wudrick,* 451 F.2d at 990; Collier 14th ed. at ¶ 6.11[3] (collecting cases).

The perennial difficulty was that the boundary between a legitimate and a fraudulent exemption was difficult to discern. As explained in the contemporary *Collier* treatise, "[T]he distinction is often a close one and depends entirely on the facts." Collier 14th ed. at ¶ 6.11[3].

Although the Bankruptcy Code of 1978 made extensive revisions to the procedure for claiming exemptions, it did not contain a provision directly authorizing exemption planning. Rather, it preserved the judge-made exemption planning doctrine forged under the Bankruptcy Act. The House and Senate Committee Reports each state that "[a]s under current law, the debtor will be permitted to convert nonexempt property to exempt property before filing a bankruptcy petition" and that the practice "is not fraudulent as to creditors." H.R.Rep. No. 95–595 at 361 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6317; S.Rep. No. 95–989 at 76, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5862.

■ The survival of the exemption planning doctrine results from the rule of construction that judge-made doctrines established under the Bankruptcy Act are presumed to have been carried forward in the Bankruptcy Code except to the extent

---

**20.** There is a continuing concealment doctrine. *Hughes v. Lawson (In re Lawson),* 122 F.3d 1237, 1240–42 (9th Cir.1997), *aff'g* 193 B.R. 520 (9th Cir. BAP 1996); *Rosen v. Bezner (In re Rosen),* 996 F.2d 1527, 1531–32 (3d Cir.1993); *Thibodeaux v. Olivier (In re Olivier),* 819 F.2d 550, 554–55 (5th Cir.1987); *Friedell v. Kauffman (In re Kauffman),* 675 F.2d 127, 128 (7th Cir.1981) (Bankruptcy Act).

Congress indicated a contrary intent. *Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 291 (9th Cir. BAP 2005). Here, Congress indicated explicit approval of the established doctrine.

### 2

The exemption planning doctrine that was carried forward into the Bankruptcy Code includes the fraud exception, which exception can have an impact on multiple fronts.

The exemption might be defeated on a fraudulent transfer theory. *E.g., Jensen v. Dietz (In re Sholdan)*, 217 F.3d 1006, 1009–10 (8th Cir.2000).

Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial of discharge under § 727(a)(2). *Smiley*, 864 F.2d at 568 (7th Cir., intent to hinder or delay); *Tveten*, 848 F.2d at 874–76 (8th Cir., debtor "did not want a mere *fresh* start, he wanted a *head* start"); *Ford*, 773 F.2d at 55 (4th Cir.); *Reed*, 700 F.2d at 990–92 (5th Cir.); *cf. Coughlin v. Cataldo (In re Cataldo)*, 224 B.R. 426, 430 (9th Cir. BAP 1998) (dictum citing *Tveten* and *Smiley* ).

As noted in the *Collier* treatise, the "potential for the denial of the debtor's discharge is a powerful incentive to tread carefully in this area." 4 COLLIER 15th ed. at ¶ 522.08[4].

Treading carefully is necessary because, as noted, it is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors. Only two things are certain about the line.

First, as already explained, denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status. *See generally* 6 COLLIER 15th ed. ¶ 727.02[3][g].

Second, there is a principle of "too much." In classical terms, it is the Sword of Damocles.[21] In the agrarian terms used by the Fifth Circuit affirming the denial of a discharge, "when a pig becomes a hog it is slaughtered." *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 931 (5th Cir.1993) (§ 727 in context of exemption planning), *quoting Dolese v. United States*, 605 F.2d 1146, 1154 (10th Cir.1979) (tax case), *and Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr.D.N.M.1981) (§ 727–exemption planning case). Damoclean or agrarian, the limiting concept is the same.

The reality is that cases finding discharge-disqualifying intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching. 6 COLLIER 15th ed. ¶ 727.02[3][f].

Beverly fits the denial-of-discharge model notwithstanding his exemption planning. Before the MSA transfer, he had nonexempt assets sufficient to pay substantially all of the $424,450 Outland judgment. After the transfer, he had no assets with which to pay the judgment. Moreover, the record is replete with evidence that Beverly was fixated on moving assets away from the reach of the Outlands. In any event,

---

**21.** The legend related by Cicero is that Damocles, a courtier of Dionysius the Elder in the 4th Century BCE, opined how happy the ruler must be. Dionysius made the point that such happiness was tempered by precarious fortune by seating Damocles at a banquet beneath a sword that was suspended over Damocles' head by a single horse hair. CICERO, TUSCULANAE DISPUTATIONES, 5.61.

however, the appellants do not challenge the exemption; they want to recover the nonexempt property that was transferred in exchange for it.

## D

The court erred when it found that Beverly's exchange of nonexempt assets for exempt assets in the process of the debtor's divorce was not fraudulent as a matter of law.

The evidence provided by the trustee and the Outlands compels the conclusion that Beverly actually intended to hinder or delay, if not defraud, the Outlands in their effort to collect upon the judgment he expected to be rendered in the Outland litigation in state court.

Under § 727(a)(2)(A), Beverly's intent to hinder or delay a creditor constitutes the requisite "intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Adeeb,* 787 F.2d at 1343.

There is a remarkably large volume of evidence of Beverly's intent to hinder or delay that is extrinsic from the fact that he transferred nonexempt property for exempt property in the MSA. As a result, it is beyond cavil that Beverly's intent was to become judgment proof and not just to protect his assets.

In short, we are left with the "definite and firm conviction" that the bankruptcy court made a mistake with respect to its findings of fact. This was clear error.

## CONCLUSION

There being overwhelming evidence of record that the debtor actually intended to hinder or delay creditors when he transferred his interest in $1 million of nonex-

empt property through the MSA, all elements of § 727(a)(2)(A) are satisfied and the debtor's discharge shall be denied.[22] Hence, the judgments entered in BAP Nos. CC–06–1273 and CC–06–1284 are REVERSED and REMANDED with instructions to enter judgment denying the discharge of the debtor.

The bankruptcy court also erred when it ruled that transfer of the debtor's interest in the nonexempt $1 million was not avoidable as a fraudulent transfer under California's UFTA, as incorporated by § 544(b). There being no genuine issue of material fact, and the plaintiffs being entitled to judgment as a matter of law, judgments entered in BAP Nos. CC–06–1250 and CC–06–1449 are REVERSED and REMANDED with instructions to enter judgment in favor of the plaintiffs, avoiding the transfer of the debtor's interest in $1 million of nonexempt property.

We emphasize that our determinations do not constitute an exercise of dominion over the retirement plan and do not affect either its exempt status under California law or its ERISA-qualified status. To the extent that the result may vitiate the MSA, that is a matter to be resolved by the former spouses in state court.

---

**22.** Because the debtor's discharge is being denied pursuant to § 727(a)(2)(A) and the transfer is being avoided under UFTA, we need not address the remainder of the arguments.