Argued and submitted December 19, 1983, affirmed December 5, 1984

# BIVENS et al,
*Respondents,*

*v.*

# HANCOCK et al,
*Appellants.*

## (81-06-17,469-L; CA A27084)

692 P2d 153

Stephen B. Fonda, Nyssa, argued the cause for appellants. With him on the briefs was Stunz, Fonda, Pratt & Nichols, Nyssa.

William F. Schroeder, Vale, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

■    Plaintiffs were guarantors on a statutorily required livestock agency bond issued to Vale Livestock Auction Co. (Vale Livestock) by Merchants Mutual Bonding Company. After Vale Livestock's default, the bonding company brought an action in federal district court against plaintiffs on their guarantees. Satisfactions were given on judgments against both plaintiffs Bivens and Munsterman on October 8, 1980, and a dismissal due to compromise was entered on behalf of plaintiff Garrett on October 27, 1980.[1] Plaintiffs thereafter commenced this action to impose a constructive trust on assets received by defendants Hancock from defendant Vale Livestock. After a trial without a jury, the court concluded that plaintiffs were entitled to relief under all five counts of the amended complaint[2] and entered judgment against all defendants, jointly and severally, for $60,000 plus interest.[3]

---

[1] The record shows that on June 2, 1980, plaintiffs Bivens paid $60,000 to Merchants Mutual Bonding Company in satisfaction of its judgment against them. In return, on May 23, 1980, Merchants Mutual assigned to the Bivenses all its right, title and interest in a judgment obtained against plaintiffs Munsterman, and all of its rights, claims or causes of action against plaintiff Garrett. The Munstermans then paid the Bivenses $18,500 on September 17, 1980, and plaintiff Garrett paid the Bivenses $16,500 on October 26, 1980.

The Hancocks contend that the trial court erred in refusing to grant defendants' motion to dismiss, because the allegations of paragraph 5, Count I, of the amended complaint (adopted by reference in each subsequent count) do not state ultimate facts sufficient to constitute a claim for relief. They also contend that the motion was improperly denied, because plaintiffs failed to prove those allegations. Paragraph 5, Count I, alleges that plaintiffs became obligated to pay the $60,000 as a result of the corporation's default. The Hancocks appear to argue that the Bivenses, having transferred no part of their claim to the Munstermans or to Garrett, are the only real claimants. Even if we were inclined to accept that contention, which we are not, the Hancocks as much as concede that the Bivenses have stated a claim. The motion to dismiss was properly denied on that basis. Insofar as the Hancocks' motion addressed plaintiffs' failure of proof, the motion itself was improper.

[2] Count I alleged the use of a fraudulent device to defraud creditors; Count II alleged a violation of a trust relationship by the Hancocks to the corporation, which affected creditors; Count III alleged that the Hancocks hold assets attributable to the corporation and thus are constructive trustees; Count IV alleged that the Hancocks have received and hold assets of the corporation in fraud of creditors; and Count V alleged that the Hancocks have been unjustly enriched with the assets of the corporation.

[3] This action was filed on June 22, 1981. On February 12, 1982, a default judgment was entered against Vale Livestock for $60,000 plus interest at 9 percent from June 2, 1980. Execution on that judgment was returned *nulla bona,* and plaintiffs filed a supplemental complaint alleging those facts and others against the Hancocks. The Hancocks appeal from a judgment entered November 5, 1982, holding them jointly and severally liable with the corporation and imposing a lien on their vendor's interest in a

■      The Hancocks appeal, contending that the trial court erred in entering judgment for plaintiffs on any of the theories alleged in the amended complaint. Because we conclude that the court properly characterized the transfer of assets from Vale Livestock to the Hancocks as a fraudulent conveyance, ORS 95.070, we do not consider the other theories under which relief might have been granted.[4] Because this is an action seeking equitable relief, we review *de novo*.

On September 15, 1964, the Hancocks purchased a livestock auction facility under a land sale contract with Orie and Cletis Leavell. They operated the facility as a proprietorship until May 11, 1971, when the business was incorporated as Vale Livestock Auction Co. By an assignment dated May 14, 1971, the Hancocks transferred their interest in the 1964 land sale contract to the corporation; however, they remained personally liable under that contract.

In exchange, the corporation issued 900 shares of stock with a par value of $100 per share, 300 shares of which were issued to each of the Hancocks in their separate names, and the remaining 300 shares were issued to them jointly. In May, 1971, they transferred their 300 jointly owned shares to Marvin Palmer, who reconveyed 50 shares to them in August, 1972. The stock ownership remained as delineated until April 16, 1975, when the Hancocks transferred their 600 individually owned shares to Nick and Mike Van Lith, who also purchased Palmer's 250 shares in July, 1975. In November, 1975, Mike Van Lith transferred his interest in the 850 shares to JoAnn Van Lith, Nick Van Lith's wife. The Van Liths later acquired the remaining 50 shares from the Hancocks.

The Van Liths made all payments through the Land Title Escrow Company to the Hancocks for the sale of the stock through May, 1977. On May 29, 1977, the auction sale facility of Vale Livestock was totally destroyed by fire. The

---

contract of sale involving the assets of the now defunct corporation.

[4] By alleging in Count III of the amended complaint that the Hancocks are constructive trustees of the assets of the corporation, plaintiffs may have been attempting to bring this case within the corporate trust fund doctrine enunciated in *Gantenbein v. Bowles,* 103 Or 277, 203 P 614 (1922). Although that theory is clearly applicable to the instant case, the parties have not directly discussed it. We therefore affirm the trial court's ruling on the basis of the theory alleged in Count I of the amended complaint, which it considered the most cogent basis for relief.

Van Liths' initial plans were to reopen the facility on June 7, 1977, but that event never took place, and within a month of the fire the Van Liths left the area for South Dakota. The Hancocks sent the Van Liths a notice of default under the stock sale contract on August 15, 1977, and on September 15, 1977, they repossessed the 600 shares of stock held in escrow.

The Van Liths also made all payments due under the Leavell land sale contract on behalf of the corporation through May, 1977. In June, 1977, both the corporation and the Hancocks received notice of default from the Leavells. The Hancocks made all payments on the contract thereafter, and on November 22, 1977, caused the balance of $120,425.74 to be paid, in return for which they received a warranty deed and bill of sale. Of that amount, $119,837.27 represented insurance proceeds payable to Vale Livestock. The remaining $588.47 was paid by the Hancocks from their personal funds.

In July, 1977, the Hancocks took physical possession of the real property which housed the livestock auction facilities. Donald Hancock testified that the only asset of the corporation was the real property which he had a right to reclaim because of the default under the Hancock-Van Lith contract. He further testified that, at that time, it was his belief that the corporation was insolvent.

On August 15, 1977, the Hancocks filed a suit to quiet title to the property against Vale Livestock. On January 3, 1978, the court entered a default judgment against the corporation and a decree quieting title in the Hancocks.[5] During the proceedings, Donald Hancock informed the court that he had caused the unpaid balance on the Leavell contract to be paid. He did not, however, tell the court that he and his wife were the controlling shareholders of the corporation by virtue of the Van Liths' default, or that the payments had been acknowledged by him in the corporate minutes to have been made on behalf of the corporation.

The annual stockholders' meeting was held on October 7, 1977. Donald Hancock, acting as chairman,

[5] In his affidavit of service on the corporation, Donald Hancock averred that the last registered agent of the corporation was Nick Van Lith. Despite the fact that at the October, 1977, stockholders' meeting Roscoe Findley was appointed registered agent, the Hancocks did not inform the court of that fact.

reported that the records of Vale Livestock had been destroyed, that the fire insurance proceeds would be just about enough to pay off the Leavell contract, that the corporation had a past due note in the sum of $80,000 and that it had overdrawn a custodial account in excess of $20,000. At the time of that meeting, the Hancocks knew that their quiet title action was pending, but did nothing to authorize, direct or require the corporation's resistance to that action. Alvina Hancock, Dennis Buttice, the Hancocks' son-in-law, and their friend, Roscoe Findley, were elected directors and thereafter authorized the use of the entire insurance proceeds to satisfy the Leavell obligation. Although Donald Hancock was not elected as a director or officer of the corporation at that time, it appears that at all times prior to the October meeting he had served as a director.

Sometime after the quiet title decree was entered, the Hancocks decided to reopen the livestock auction facility. They presented evidence at trial which showed that they borrowed $125,000 to rebuild and license the facility, and invested $35,000 in refurbishing corrals. They contend that they personally paid $12,713.92 in clean-up expenses after the fire. A listing of those expenses, however, shows that $3,054.95 was paid in interest on the Leavell contract, almost $2,700 was paid for the Hancocks' attorney fees, and many of the other charges concern taxes and improvements of facilities not involved in the fire. At trial, Donald Hancock valued his time in the clean-up at $14,000, but the October, 1977, corporate minutes contain the announcement by Hancock that his total charge was $9,200. Additionally, the Hancocks contend that they paid Roscoe Findley $6,800 for cleaning up after the fire.

The Hancocks opened Eastern Oregon Livestock Auction on August 11, 1978. Vale Livestock was not, however, dissolved until November 19, 1978, and then involuntarily. On January 25, 1980, the Hancocks sold Eastern Oregon Livestock Auction to Raymond and Sandra DeBruycker for $460,000.

The county assessor testified that after the fire the real property owned by Vale Livestock had a value of $39,800 and the improvements on the property had a value of $43,990, taking into account a "nonusability factor" used for tax

assessment purposes. If that factor were ignored, the combined value of the real property and improvements was $136,290. Together with insurance proceeds paid to the corporation in the amount of $119,837.27, the assets of the corporation at the time of the transfer to the Hancocks totalled at least $203,627.27.

ORS 95.070 provides:

> "Every conveyance or assignment in writing or otherwise of any estate or interest in lands, goods or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered with the like intent, as against the person so hindered, delayed or defrauded is void."

ORS 95.090 provides that the question of fraudulent intent is one of fact, not of law.

■    Although the Hancocks are correct in contending that ORS 95.070 does not prevent a debtor from preferring one creditor over another, when a transfer by a debtor in preference of creditors is made under circumstances involving so-called "badges of fraud," the burden is on the transferee to demonstrate that the transfer was not fraudulent by proof that it was not made with an intent to defraud other creditors, that the consideration was fair and adequate and that no benefit was secured or reserved to the grantor. *Nelson v. Hansen,* 278 Or 571, 578, 565 P2d 727 (1977).

■■    Here, there are sufficient "badges of fraud" to shift the burden to the Hancocks to show that the transfer of assets from the corporation to them by means of the quiet title action was not made with intent to defraud corporate creditors. First, the consideration given by them was inadequate. Even accepting their figures as to the extent of the corporation's indebtedness to them, they, at most, transferred $33,513.92 to the corporation, for which they received $203,627.27 in corporate assets. Second, although the trial court found that whether the corporation was insolvent would depend on an accounting process not undertaken in this action, it concluded that after the fire the corporation was in serious financial difficulty.

Moreover, Donald Hancock testified that he believed that the corporation was insolvent after the fire. Third, the conveyance was a transfer of all or substantially all of the corporation's property. Finally, a close business relationship between the transferor and transferee has been held to be a badge of fraud. *Clarke v. Philomath College,* 99 Or 366, 378, 193 P 470, 195 P 822 (1921). Here, the Hancocks were the controlling shareholders of the corporation, and at all relevant times either the husband or wife was a director. As such, they were in a position and had an obligation to authorize or require the corporation's defense of the quiet title action, which sought to forfeit the corporation's rights as assignee of the Leavell contract to the Hancocks. The fact that they did neither is more evidence of fraudulent intent.

The Hancocks contend that plaintiffs were not damaged by the transfer and cannot be heard to complain, because if the corporation had not transferred the property to them, the Leavells, as secured creditors, would have removed the property from plaintiffs' reach by foreclosing their land sale contract. They attempt to analogize their situation to that in *Stach v. Jackson,* 40 Or App 249, 594 P2d 1289 (1979), and cite the following language from that case in support of their argument:

> "All things considered, it is difficult to understand how plaintiffs think they have been defrauded, hindered or delayed. It is apparent that if the Jacksons had done nothing, the mortgage would have been foreclosed and the redemption period would probably have expired prior to plaintiffs' obtaining a judgment. Even if the Jacksons had sold their redemption rights, there is nothing in the record to indicate how much they might have realized. * * *" 40 Or App at 254.

In *Stach,* however, we found that Jackson's stated reasons for conveying the property were credible and that the consideration given was adequate. Jackson conveyed the property to avoid foreclosure only after the bank had exercised its right to accelerate the principal and Jackson had unsuccessfully attempted to borrow money from several sources to save the property. Moreover, we found that the value of any right of redemption was uncertain, because the property was owned by tenants in the entireties and the right to levy execution against one tenant by the entirety is more theoretical than real. 40 Or App at 252-55.

Here, the Hancocks have not attempted to show that adequate consideration passed to the corporation for the transfer to them or that the assets were transferred as a last resort. It is inconceivable that the Leavells would have attempted to strictly foreclose their contract after the insurance proceeds were applied to the contract; only a few hundred dollars remained unpaid. If they had attempted to do so, it is highly unlikely that a court would have done more than order the property sold at a sheriff's sale, leaving the corporation with a valuable right of redemption. On the other hand, if the Leavells had strictly foreclosed before the insurance proceeds were applied to the contract, the corporation would have had $119,837.27 out of which to satisfy its other obligations. The fact is that the corporation had reasonable options by which it could have salvaged at least some of its assets, including filing proceedings in bankruptcy, thereby staying any legal actions against it. There does not appear to be any reason why it could not have borrowed the few hundred dollars needed, in addition to the insurance proceeds, to pay off the contract in full. Had it done so, it could have saved assets valued between $83,000 and $136,000.

■■ Instead of making any effort to salvage the corporate assets, the Hancocks caused the corporation to pay the insurance proceeds to the Leavells and then obtained a default judgment against the corporation, resulting in a judgment that had the effect of forfeiting the corporation's rights as assignee of the Leavell contract and quieting title to the property in themselves. In taking the default judgment, they violated their fiduciary duty to the corporation and its creditors. Under these circumstances, we agree with the trial court that the transfer of assets was made with an intent to defraud corporate creditors, including plaintiffs.

The amount of traceable assets exceeds the judgment in this action. Thus, there is no infringement on the personal investment of the Hancocks. Because the assets have passed into the hands of an innocent purchaser, the trial court's imposition of an equitable lien on payments due under the Hancock-DeBruycker contract dated January 15, 1980, is an appropriate remedy.

Affirmed.