978 F.2d 516
 27 Collier Bankr.Cas.2d 1390, Bankr. L. Rep. P 74,983
In re Blair B. WOODFIELD, Debtor.
In re Marie Z. WOODFIELD, Debtor.
In re Parley A. PEARCE, Debtor.
In re Deanna PEARCE, Debtor.
EMMETT VALLEY ASSOCIATES, Plaintiff-Appellant,
v.
Blair B. WOODFIELD; Marie Z. Woodfield; Parley A. Pearce;
Deanna Pearce; Quality Foods, Inc., an Oregon
Corporation, Defendants-Appellees.
 No. 91-35794.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1992.
Decided Oct. 22, 1992.
 
 Robert A. Wyler, Dillon, Colo., for plaintiff-appellant.
 Daniel F. Vidas, Dunn, Carney, Allen, Higgins & Tongue, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before BEEZER, NOONAN and TROTT, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 Blair B. and Marie Z. Woodfield and Parley A. and Deanna Pearce (Debtors) sought discharge in bankruptcy under Chapter 7. A creditor, Emmett Valley Associates (EVA), objected. The bankruptcy court overruled EVA's objections and the district court affirmed. We reverse.
 
 FACTS
 
 2
 The Debtors as partners operated two "Wendy's Famous Hamburgers" restaurants in Walla Walla, Washington and LaGrande, Oregon, pursuant to a franchise from Wendy's International, Inc. On March 10, 1989 the Debtors filed their petitions for bankruptcy under Chapter 7. Within 10 days prior to this date the Debtors had formed a new corporation, Quality Foods, Inc. (QFI), in which they each held a 50 percent interest. To this corporation they then transferred the franchise operating rights to Wendy's Restaurant of LaGrande, Oregon and Wendy's Restaurant of Walla Walla, Washington; the equipment and fixtures used in the operation of those restaurants valued at $40,000; and the inventory and restaurant supplies valued at $11,000 at the time of transfer. Pursuant to ORS 76.1050 they gave their creditors a "Notice of Bulk Transfer" of these transactions. They received the stock of QFI in exchange for the assets transferred.
 
 
 3
 Apart from this exchange, Woodfield transferred $10,100 in cash and Pearce transferred $6,954 in cash to QFI. The transfer occurred within 10 days of the Debtors' bankruptcy filing.
 
 
 4
 Prior to the bankruptcy filing the Debtors were somehow able to ascertain that Wade Bettis, Jr. would be their trustee in bankruptcy if they filed, and they discussed all of the foregoing transactions with him. He agreed that, because of the security interests in the restaurant property, these assets were without value and that he could not cure existing defaults in the franchises held from Wendy's International, Inc. Bettis also discussed the transfer of the $10,000 in cash with the Debtors' lawyer, Daniel F. Vidas. In the discussion Vidas indicated that the payment "could be construed as a preferential transfer. But we also talked about the code section that says that people who were owed wages within 90 days of the filing of the bankruptcy are entitled to be paid those monies immediately." Vidas and Bettis discussed the fact that Vidas "would have a claim for administrative priorities [a]nd [there would be a priority for taxes]."
 
 
 5
 At the creditors' meeting on April 25, 1989 Bettis as trustee filed a "no asset" report. Meanwhile, having secured a forbearance agreement from Wendy's International, Inc., the Debtors continued to operate the two restaurants. On July 15, 1989 Pearce and Woodfield agreed to dissolve QFI, Inc.; Woodfield acquired sole ownership of Wendy's in Walla Walla; Pearce acquired sole ownership of the Wendy's in LaGrande.
 
 PROCEEDINGS
 
 6
 On June 26, 1989 EVA, an unsecured creditor, objected to the Debtors' discharge, stating its belief that the Debtors had "fraudulently misrepresented the true value of their assets" and had transferred the operation of the two Wendy's to a new corporation in recognition of a value in the franchises in excess of what they had disclosed. EVA subsequently moved for turnover of certain properties of the Debtors and the voidance of the transfers to QFI, Inc.
 
 
 7
 In August of 1989 the trustee formally moved to abandon the assets of the two Wendy's. After a trial the bankruptcy court approved the abandonment. The court issued an opinion prepared by Vidas without altering it in any respect. The opinion was divided into two sections, "Background" and "Discussion and Analysis." Under the latter heading it was stated that the transfer of the $17,000 was "necessary to meet payroll due in the next few days and cover checks already written on partnership debts relating to the restaurant operations." After further discussion under this heading it was stated that the Debtors "had no fraudulent intent in making these transfers and neglecting to list them on their statement of affairs, nor were creditors, the trustee or the estate hindered or misled by them."
 
 
 8
 EVA appealed to the district court, which in a written opinion affirmed the judgment of the bankruptcy court. On the critical question of the transfers of the cash, the district court made no independent findings of fact but simply noted: "I do not find the bankruptcy judge erred in making these factual findings."
 
 
 9
 EVA appeals.
 
 ANALYSIS
 
 10
 EVA argues that the Debtors intended to hinder or defraud their creditors in their transfer of cash to QFI. It urges the court to refuse to discharge the Debtors' obligations under 11 U.S.C. § 727(a)(2). We agree. The district court, affirming the bankruptcy court, clearly erred as to the Debtors' intent to hinder, delay or defraud.
 
 
 11
 To deny a discharge under this section, the court must find that the Debtors harbored actual intent to hinder, delay or defraud a creditor or officer of the estate. The existence of this intent is a finding of fact reviewable for clear error. We may infer the intent from the circumstances surrounding the transaction. In re Adeeb, 787 F.2d 1339, 1342-43 (9th Cir.1986). Certain "badges of fraud" strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer. See Evans v. Trude, 193 Or. 648, 240 P.2d 940, 944 (1952); Hughey v. Lind, 92 Or.App. 433, 758 P.2d 431, 433 (1988); Bivens v. Hancock, 71 Or.App. 273, 692 P.2d 153, 157 (1984); see also In re Ayala, 107 B.R. 271, 274-75 (Bankr.E.D.Cal.1989) (similar but not identical list of indicia of fraud).
 
 
 12
 The transaction here carried many of these badges of fraud. The relationship between the Debtors and the corporation could not have been closer; the Debtors created and operated the transferee corporation. The transfer was admittedly made in anticipation of the bankruptcy filing. The partnership was admittedly in poor financial condition at the time, having defaulted on several obligations. Substantially all of the partnership's property relating to the Wendy's franchises was transferred, leaving nothing to satisfy any judgments; hence the trustee abandoned claims on the estate.
 
 
 13
 More than a dry checklist of badges of fraud demonstrates the Debtors' intent, however. The Debtors concededly were trying to delay or prevent seizure of the assets. They omitted the transfers from their statement of affairs in bankruptcy. They offer a justification for the transfer of cash that does not fit the facts, as explained below. They performed a second transfer, in which the QFI stock, which supposedly replaced the $17,000 in the estate, was rendered worthless. The net effect of the scheme was to remove $17,000 from the hands of the creditors and place it in the hands of the Debtors beyond the apparent reach of the creditors, who were thereby hindered and defrauded.
 
 
 14
 Woodfield and Pearce contend that the cash was transferred to pay wages that they owed; since they believed that the wage claimants would have had priority over general creditors, they argue, there was no intent to hinder or defraud. In fact, however, both Debtors admitted that the funds were used for many purposes other than paying wages. Woodfield admitted that after the transfer the account containing the $10,000 paid for advertising, a philanthropic donation, food, utilities, office supplies and storage rental. Pearce admitted that the $6954 was what happened to be in a partnership account when the account was turned over to QFI. Several checks from that account also paid for non-payroll items. Postpetition restaurant revenues were commingled with the transferred money. All of this suggests that a random amount of cash, unconnected to the amount expected to be paid out in back wages, was put into a general-purpose account and used for general purposes, and no attempt was made to ensure that the cash was used only for wage claims. The bankruptcy court clearly erred in holding that the cash transfers were necessary to pay wages. The bankruptcy court clearly erred in holding that the Debtors' intent was not fraudulent. The district court clearly erred in affirming the bankruptcy court on these points. The Debtors intended to put the cash beyond the creditors' reach.
 
 
 15
 Bettis' acquiescence in the transactions does not improve their status. That the Debtors knew in advance of the filing who their trustee in Chapter 7 would be and conferred with him as if he had been designated, seems to this court extraordinary. Even if it were likely that Bettis was going to be the Trustee, it was improper for him to involve himself in the case before he was appointed. In any event, prior to filing Bettis had no authority and his awareness of the transactions could not constitute approval.
 
 
 16
 The Debtors transferred property with intent to hinder, delay or defraud creditors. Their discharge must be denied pursuant to 11 U.S.C. § 727(a)(2). Adeeb, 787 F.2d at 1342.
 
 
 17
 REVERSED and REMANDED for proceedings consistent with this opinion.
 
 TROTT, Circuit Judge, concurring:
 
 18
 I concur in the majority's conclusion that both the bankruptcy court and the district court clearly erred in holding the debtor's intent was not fraudulent, and I write only to express my concern about the undesirable manner in which the bankruptcy court's opinion was prepared. In sum, it was entirely the work of counsel for the debtors, and it was signed and adopted by the court without any input from counsel for EVA. The rule in this circuit is that we review a trial court's findings of fact for clear error. However, where a judge announces generally a decision and leaves it to counsel for the prevailing party to draft an opinion, we subject such an opinion to "careful scrutiny." L.K. Comstock & Co. v. United Eng. & Constructors Inc., 880 F.2d 219 (9th Cir.1989) ("Comstock"). This rule casts a shadow on the bankruptcy court's and the district court's findings of fact in this case, and the offending opinion amply illustrates the wisdom of our cautionary rule.
 
 
 19
 With all respect, the bankruptcy judge's opinion, ghosted by the debtors' counsel, reads as a whole more like an advocacy piece for them than a considered judicial product. It inappropriately glosses over the important issue of cash transfers from the restaurants to Quality Foods as if the transfers had no importance. The opinion also claims without support in the record that the trustee "agreed" and "consented" to counsel's proposal for these cash transfers. When pressed at oral argument, counsel admitted that the word "agreed" overstated the record, and asked us to focus instead on the bankruptcy judge's oral findings. When asked what these findings indicate in terms of the cash transfers, counsel examined the record and could produce nothing germane. Neither can I. Moreover, referring to Mr. Bettis as "the trustee" in connection with this conversation about cash transfers is misleading. Counsel concedes that Mr. Bettis had not even been appointed at the time of the conversation!
 
 
 20
 This is a classic example of what the Supreme Court has described as "overreaching and exaggeration [by] attorneys preparing findings of fact." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985). Under the circumstances, I respectfully doubt that the bankruptcy court's opinion represents "the judges's own considered conclusions." Id. at 573, 105 S.Ct. at 1511.
 
 
 21
 Debtor's counsel tells us this problematic approach to preparing bankruptcy opinions is standard in his area. If so, it must be modified immediately to insure that the abuses I find here are not repeated in other cases. A judicial officer may not "uncritically accept" the offering of counsel. Comstock, 880 F.2d at 222 (quoting Clady v. County of Los Angeles, 770 F.2d 1421, 1427 (9th Cir.1985) cert. denied, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986)). We must make sure we do our own work, not let the lawyers do it for us.