**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   CC-16-1328-PaTaKu |
| JOSEPH ELLISON, ) | Bk. No.   2:14-bk-24463-RK |
| Debtor. ) | Adv. No.  2:15-ap-01001-RK |
| _____ ) | |
| JOSEPH ELLISON, ) | |
| Appellant, ) | |
| v. ) | **M E M O R A N D U M**[*] |
| JPMORGAN CHASE BANK, N.A.; ) JPMORGAN SECURITIES, LLC, ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on July 27, 2017
at Pasadena, California

Filed - September 8, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Robert N. Kwan, Bankruptcy Judge, Presiding

Appearances:    David Scott Hagen of Law Offices of David S. Hagen argued for appellant; Stefan Perovich of Keesal Young & Logan argued for appellees.

Before: PAPPAS,[**] TAYLOR, KURTZ, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see Fed. R. App. P. 32.1, it has no precedential value, see 9th Cir. BAP Rule 8024-1.

[**] The Honorable Jim D. Pappas, United States Bankruptcy Judge for the District of Idaho, sitting by designation.

Chapter 7[1] debtor Joseph Ellison ("Debtor") appeals from the bankruptcy court's judgment denying him a discharge under § 727(a)(2)(A). Debtor argues that the bankruptcy court erred, as a matter of law, by considering certain transfers he made prior to the bankruptcy filing as evidence of his intent to hinder or delay a creditor. Absent those errors, Debtor contends, the bankruptcy court could not have found he had the requisite intent in order to deny discharge. Debtor also argues that several of the bankruptcy court's critical factual findings were clearly erroneous. For the reasons explained below, we disagree and AFFIRM.

## I. FACTS[2]

**A.    The FINRA Action and Shustak Fee Dispute**

Debtor lived in Los Angeles, California; he was employed by JPMorgan Chase Bank, N.A. and JPMorgan Securities, LLC ("JPM") as a financial advisor until approximately April 2012. While employed by JPM, Debtor developed an animus towards JPM.

In June 2012, Debtor commenced an arbitration action against JPM before the Financial Regulatory Authority ("FINRA") asserting various claims related to his employment. JPM filed a counterclaim in the FINRA action alleging that Debtor breached a

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2] These facts are drawn largely from a stipulation of facts entered into by the parties in the bankruptcy court, and from Debtor's testimony at both a Rule 2004 examination and at the trial in the § 727 action.

-2-

contract by failing to repay a $750,000 loan.

Initially, Debtor was represented in the FINRA action by Shustak & Partners LLP ("Shustak"). However, Debtor terminated Shustak due to a fee dispute, and a new attorney appeared for Debtor. While Debtor believed that he did not owe Shustak additional fees, Shustak disagreed, sued Debtor in state court, and promptly scheduled an ex parte hearing before the court seeking to freeze all of Debtor's assets. Debtor testified that he did not learn about the hearing until the night before, and as a result, his wife, who is a lawyer, had to make a 4 a.m. trip to San Diego to attend the hearing to thwart Shustak's efforts. Based upon this experience, Debtor testified he feared Shustak's further collection efforts.

**B.    Debtor Consults an Asset Protection Attorney**

In January 2014, Debtor was concerned enough with protecting his assets that he thought it prudent to travel to Nevada to meet with an asset protection attorney, Glen Woods ("Woods"). Debtor testified he understood that Woods' financial planning services were legal and appropriate and that one of his goals in meeting with Woods was to learn how to protect his assets from potential creditors.

Although Debtor found Woods to be sophisticated and knowledgeable, Debtor testified that he declined to follow Woods' advice and sought a refund of the fees paid to Woods because, in the days following the meeting, Woods failed to return his calls and provide documents requested by Debtor.

**C.    Bank Accounts**

During relevant times, Debtor had several financial

-3-

accounts, including a City National Bank account ("Debtor's CNB Account") and a Mutual Securities, Inc. account ("Joint Account"). Importantly, when he later filed for bankruptcy relief, Debtor did not effectively claim an exemption in the funds in either of these accounts.[3]

Debtor's wife had an account in the name of her law office at City National Bank ("Wife's CNB Account"). Debtor testified that this was an account she used to pay both their personal bills and law office expenses. Debtor indicated he was not a signatory on the account and had no control over the way she used the funds in it. Even so, Debtor claimed the funds in Wife's CNB Account as exempt in his bankruptcy schedules.

In the years leading up to the bankruptcy filing, the couple's income was insufficient to support their lifestyle. Debtor testified that they were living off withdrawals from two IRAs maintained by him and his wife while he rebuilt his business. He explained that he would regularly transfer funds from the IRAs to Debtor's CNB Account, and then transfer the funds from Debtor's CNB Account to Wife's CNB Account, to pay their personal bills.

**D.    The Refinancing of Debtor's Home Mortgages**

Debtor and his wife owned a home in Los Angeles ("the Property"). While the FINRA action was pending, they refinanced

---

[3] To be precise, in his Schedule C, Debtor listed the accounts with "(exempt)" in parenthesis at the end of the description. But the value of the claimed exemption in the schedule was "$0.00." Debtor perhaps did this because he had used the entire amount of the exemption provided under C.C.P. § 703.140(b)(5) to claim the funds in Wife's CNB Account exempt.

-4-

the two mortgages on the Property. Debtor testified that the purpose of this refinancing was to survive during the arbitration and to allow him to avoid further depleting the IRAs. Debtor began his efforts to refinance the mortgages in the fall of 2013.

On February 14, 2014, Debtor and his wife obtained a new loan for approximately $1,500,000 secured by a deed of trust on the Property ("First DOT"). Two weeks later, Debtor and his wife obtained another loan for $200,000 secured by a second deed of trust on the Property ("Second DOT"). After the existing deeds of trust encumbering the Property were paid off, the remaining cash proceeds from the First and Second DOTs were deposited in Debtor's CNB Account. As a result of these deposits, as of March 1, 2014, Debtor's CNB account contained approximately $249,000 of loan proceeds.

Debtor testified that based on appraisals he saw prior to refinancing, he believed there was still significant equity in the Property after refinancing. According to Debtor, he did not realize the Property may be worth only approximately $1.5 million until June 2014, when he saw "Zillow" numbers and appraisals done in anticipation of his bankruptcy filing. If the Property was indeed valued at $1.5 million when the mortgages were refinanced, and the First and Second DOTs totaled approximately $1.7 million, the Property was fully encumbered after the refinance.

**E.    Transfers and the Outcome of the FINRA Action**

In March 2014, Debtor transferred approximately $38,000 from Debtor's CNB account to two of his friends. Debtor testified at his Rule 2004 examination that he did so to repay a personal loan, and a business project loan, although Debtor acknowledged

-5-

that he had used the purported business loan proceeds to pay for living expenses.

In April 2014, Debtor made payments to two experts for the litigation with JPM. Debtor testified that, at that time, he still believed he would prevail against JPM.

From April 28 to May 6, 2014, the FINRA panel conducted an evidentiary hearing concerning Debtor's claim and JPM's counterclaim.

Later in May 2014, Debtor transferred $18,000 from Debtor's CNB Account into Wife's CNB Account.

On June 3, 2014, the FINRA panel issued a decision rejecting Debtor's claims against JPM; the decision awarded JPM approximately $790,000.

Following entry of the award, in June 2014, Debtor transferred an additional $51,000 from Debtor's CNB Account to Wife's CNB Account. Debtor also transferred $121,000 from Debtor's CNB Account to the bank account of a corporation wholly-owned by Debtor, Clownputsch, Inc. ("the Clownputsch Account"). But a few days later, Debtor transferred $119,000 back from the Clownputsch Account to Debtor's CNB Account. Debtor testified at his Rule 2004 examination that he made the transfer to the Clownputsch Account, in part, because he was afraid people were going to take his money and leave his family destitute.

**F.    Prepayment of the Property Mortgages**

On July 9, 2014, six days after receiving notice of the FINRA award, and three weeks before filing his bankruptcy petition, Debtor used funds in Debtor's CNB Account to make payments of approximately $41,000 and $11,000 to the lenders on

-6-

the First and Second DOTs, respectively. Debtor instructed them to apply these amounts to the next six monthly payments due on the loans.

Debtor acknowledged that he had never previously made prepayments on the mortgages so far in advance. He explained that he made these payments because he wanted to protect his family and to ensure money was not available for Shustak to seize. At his Rule 2004 examination, Debtor also testified he felt the need to protect his family because of the FINRA award and threatening letters he received from JPM.

On July 17, 2014, JPM commenced an action in the United States District Court for the Central District of California for judicial confirmation of the FINRA award.

**G.   The Bankruptcy Case and More Transfers**

On July 29, 2014, Debtor filed a chapter 7 petition. Debtor acknowledged that, but for the JPM award, he would not have filed for bankruptcy relief. Debtor's Schedule F lists unsecured debts totaling approximately $925,000, including an undisputed claim of $789,000 owed to JPM on account of the FINRA award, and a disputed $45,000 debt owed to Shustak for attorneys fees. These were Debtor's two largest unsecured creditors.

Just before Debtor filed his petition, in four separate transactions, Debtor transferred approximately $31,600 from the non-exempt Joint Account to various parties, including a $17,000 transfer to Wife's CNB Account on the petition date. As a result of the four transfers, the balance of the Joint Account decreased from approximately $33,000 to the approximately $2,000 Debtor disclosed in his Schedule B.

-7-

**H.    The Adversary Proceeding**

On January 2, 2015, JPM filed an adversary complaint objecting to Debtor's discharge pursuant to § 727(a)(2)(A).[4] The parties filed a pre-trial stipulation setting forth uncontested facts, which the bankruptcy court approved. On November 19, 2015, the bankruptcy court conducted a trial in the adversary proceeding at which Debtor testified. On September 23, 2016, the bankruptcy court entered a memorandum decision and judgment denying Debtor's discharge under § 727(a)(2)(A) because, it determined, Debtor made transfers within the year preceding the filing of his bankruptcy petition with the intent to hinder or delay a creditor.

Debtor timely appealed the judgment denying discharge.

## II.    JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). The Panel has jurisdiction over this appeal under 28 U.S.C. § 158(b).

## III.    ISSUE

Did the bankruptcy court err by denying Debtor's discharge under § 727(a)(2)(A)?

## IV.    STANDARD OF REVIEW

In reviewing a judgment denying a discharge, we review: "(1) the bankruptcy court's determinations of the historical

---

[4] JPM also objected to Debtor's discharge under § 727(a)(2)(B). The bankruptcy court decided that JPM abandoned this claim by failing to introduce evidence or argument to support it at trial. Thus, the court based its judgment against Debtor solely on § 727(a)(2)(A). JPM has not argued otherwise in this appeal.

-8-

facts for clear error; (2) its selection of the applicable legal rules under § 727 de novo; and (3) its application of the facts to those rules requiring the exercise of judgments about values animating the rules de novo." DeNoce v. Neff (In re Neff), 505 B.R. 255, 262 (9th Cir. BAP 2014) (citing Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004), aff'd, 212 Fed.Appx. 589 (9th Cir. 2006)).

The bankruptcy court's determinations concerning the debtor's intent are factual matters reviewed for clear error. Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 729 (9th Cir. BAP 1999). Fact findings are clearly erroneous if they are illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). We give great deference to the bankruptcy court's fact findings when based upon its determinations as to the credibility of witnesses. Id. If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-75 (1985); Ng v. Farmer (In re Ng), 477 B.R. 118, 132 (9th Cir. BAP 2012).

**V. DISCUSSION**

The bankruptcy court denied Debtor's discharge under § 727(a)(2)(A), which provides that:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . property of the debtor, within one year before the date of the filing of the petition.

§ 727(a)(2)(A).

The party seeking denial of a discharge under § 727(a)(2) must prove by a preponderance of evidence that there was: "(1) a

-9-

disposition of property, such as a transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997); Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007) (holding that the burden of proof in a § 727 action is a preponderance of the evidence). Courts should interpret § 727 liberally in favor of debtors and strictly against parties objecting to discharge. In re Retz, 606 F.3d at 1196 (quoting Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)).

**A. Transfers**

Relying on the Code's definition of "transfer", § 101(54), the bankruptcy court concluded that, because each of the following transactions involved the disposition of or parting with property occurring within the statutory time period, they constituted transfers by Debtor for purposes of the first Lawson element:

(1) the refinancing of the mortgages on the Property and the transfers of the loan proceeds to Debtor's accounts;

(2) the $38,000 transfer to pay off loans from friends;

(3) the $51,000 transfer to Wife's CNB Account;

(4) the five months of prepayments made to the mortgage lenders;[5]

---

[5] The bankruptcy court found that because the amounts Debtor paid the lenders included the currently-due monthly payment, the transfers amounted to only a five month prepayment, despite the (continued...)

-10-

(5) the $31,600 in transfers from the Joint Account, including $17,000 to Debtor's wife on the petition date; and

(6) the $2,000 transferred to the Clownputsch Account that was not later transferred back.

We agree with the bankruptcy court that these transactions were transfers for purposes of deciding whether Debtor's discharge should be denied under § 727(a)(2)(A).[6]

**B.    Intent**

Whether Debtor acted with the intent to hinder, delay, or defraud a creditor in making the subject transfers in this case "is a question of fact that requires the trier of fact to delve into the mind of the debtor." In re Searles, 317 B.R. at 379 (citing Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)). To do so, the bankruptcy court could infer Debtor's intent from the circumstances surrounding the transactions. In re Woodfield, 978 F.2d at 618 (citing First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342-43 (9th Cir. 1986)). Debtor's course of conduct could also be probative on the question of his intent. Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007), aff'd in

---

[5](...continued)
parties' stipulation that it was six months.

[6] At oral argument, Debtor for the first time challenged the bankruptcy court's decision that some of these transactions qualified as "transfers" for purposes of § 727(a)(2)(A). However, Debtor waived that argument by failing to raise it in his opening brief, and we decline to address it. See Darby v. Zimmerman (In re Popp), 323 B.R. 260, 273 (9th Cir. BAP 2005) (citing Laboa v. Calderon, 224 F.3d 972, 982 n.6 (9th Cir. 2000)).

-11-

part, dismissed in part, 551 F.3d 1092 (9th Cir. 2008) (citing In re Adeeb, 787 F.2d at 1343 and other cases)).

In this appeal, Debtor focuses on two questions, both of which he argues are "legal" issues concerning the bankruptcy court's decision:

(1) Did the bankruptcy court commit an error of law by considering Debtor's pre-bankruptcy payments to creditors as evidence of his intent to hinder, delay, or defraud a creditor?

(2) Did the bankruptcy court err, as a matter of law, by considering his transfer of community property funds from Debtor's CNB Account to Wife's CNB Account as evidence of Debtor's intent to hinder, delay, or defraud a creditor?

Debtor also contests a number of the specific factual findings made by the bankruptcy court.

**1.  Payments to Creditors as Evidence of Intent to Hinder or Delay a Creditor**

The bankruptcy court concluded that while Debtor's prepayments to the mortgage lenders, standing alone, could not support a denial of discharge, those transfers could be considered as evidence of his intent in making the transfers, and others, in connection with the other relevant facts.  Relying on the Ninth Circuit's decision in Hultman v. Tevis, Debtor argues that the bankruptcy court erred, as a matter of law, when it considered the mortgage prepayments as evidence of his intent to hinder or delay a creditor.  82 F.2d 940 (9th Cir. 1936).  We disagree.

In Hultman, within the year preceding the debtor's bankruptcy, he used money he received from a spendthrift trust to partially pay a large debt owed to his son.  82 F.2d at 941.

Prior to making the payment, the debtor's attorney advised him that the money received from the trust could not be taken by his creditors, even after it reached his hands. Id. In litigation in his bankruptcy case, a special master found that:

> The bankrupt, in good faith, believed and relied on his attorneys' advice and acted on it in making the transfer to his son. Furthermore, the amount of money so transferred was less than the amount then owing by the bankrupt to his son. **The mere fact a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge**.

Id. (emphasis added). Based upon these findings, the district court rejected the trustee's objection to the debtor's discharge. Id. On appeal by the trustee to the Ninth Circuit, the master's findings of fact were not challenged by the trustee, and were accepted by the Ninth Circuit. Id.

Debtor urges us to interpret the highlighted statement that was accepted by the Ninth Circuit in Hultman to mean that a debtor's payment or transfer to a creditor can never be considered as evidence of the debtor's intent to hinder, delay, or defraud his other creditors. But Hultman does not so hold. First, the debtor in Hultman was found to have made the transfers in good faith because of his reliance on the advice of counsel. 82 F.2d at 941. And second, because the debtor in Hultman made the transfers in good faith, "the mere fact" that the debtor elected to pay a creditor was the "only" fact that supported denial of discharge. Id.

Unlike in Hultman, here, Debtor did not rely on advice of counsel in making the various transfers to his creditors. In addition, the bankruptcy court identified more than a single payment to a creditor to support its decision to deny Debtor's

-13-

discharge. Therefore, Hultman does not control. Instead, we conclude that, in determining whether Debtor should benefit from a discharge of creditors' claims against him, the bankruptcy court did not err by considering Debtor's prepetition payments to his mortgage and other creditors, along with all other relevant evidence, to discern whether Debtor acted with the sort of intent discouraged under § 727(a)(2)(A).

This interpretation of § 727(a)(2)(A) and Hultman is consistent with the Panel's prior decisions. Recently, in Cooke, although all but one of the debtor's transfers were payments to creditors, a majority of the Panel affirmed the bankruptcy court's decision denying a discharge under § 727(a)(2)(A), perceiving no clear error had been made by the bankruptcy court in finding that debtor intended to hinder or delay a judgment creditor. 2016 WL 4039699 at * 6.[7] In that case, like here, the debtor testified that he knew the objecting creditor might try to collect and that he did not want the creditor to have the money he paid to other creditors. Id. There was also other evidence to support the bankruptcy court's finding that the debtor acted with the requisite intent. Id. at *7[8]; see also Perrine v. Speier (In re Perrine), 2008 WL 8448835, *5 (9th Cir BAP 2008) ("unlike [in] Hultman, there was additional evidence of intent to

---

[7] The majority in Cooke distinguished Hultman because the debtor did not effectively raise any "advice of counsel" defense. 2016 WL 4039699 at *5 n. 5.

[8] The bankruptcy court considered the timing and amount of the transfers, debtor's motivation to make the transfers, and the credibility of the debtor's explanation regarding the transfers. In re Cooke, 2016 WL at *7 n.6.

-14-

defraud or delay . . . .").

Of course, the Cooke decision was not unanimous, and Debtor urges us to adopt the position taken in the dissent. But the dissent specifically acknowledges that its "analysis is independent of the bankruptcy court's finding of intent." Id. at *14. Thus, the dissent's reasoning in Cooke is inapplicable under the facts in this case.

For these reasons, the Panel concludes that the bankruptcy court committed no legal error and properly considered the transfers made by Debtor to some of his creditors, with other relevant evidence, to determine his intent to hinder or delay a creditor.

### 2. Transfer of Community Property from Debtor's CNB Account to Wife's CNB Account

In a similar vein to his first argument, relying on Gill v Stern (In re Stern), 345 F.3d 1036 (9th Cir. 2003), Debtor argues that the bankruptcy court erred, as a matter of law, by considering Debtor's transfer of funds from the non-exempt Joint and Debtor's CNB Accounts to the exempt Wife's CNB Account as evidence that he "crossed the line" between acceptable and prohibited pre-bankruptcy planning. The bankruptcy court considered Stern, and concluded that, although a debtor's pre-bankruptcy transactions converting non-exempt assets to exempt assets may not be fraudulent in isolation, such transfers could support a denial of discharge if accompanied by a subjective intent to hinder, delay, or defraud a creditor. The Panel agrees.

In Stern, the Ninth Circuit examined whether a transfer was

-15-

fraudulent for purposes of determining whether the debtor could claim an exemption in the funds transferred. 345 F.3d at 1042-1044. "[T]he principle evidentiary inference relied upon by the Trustee [was] that non-exempt assets were converted to exempt assets immediately prior to bankruptcy." Stern, 345 F.3d at 1044. The Ninth Circuit held that "this inference is insufficient as a matter of law to establish a fraudulent transfer." Id. (citing Wudrick v. Clements, 451 F.2d 988, 989 (9th Cir. 1971) ("the purposeful conversion of non-exempt assets to exempt assets on the eve of bankruptcy is not fraudulent per se.")) To Debtor, this means that a bankruptcy court cannot consider the conversion of nonexempt assets to exempt status as evidence of an intent to hinder or delay a creditor under § 727(a)(2)(A). But Stern is distinguishable when compared to the facts of this case.

Of course, Stern was not a denial of discharge case; and it only considered whether the debtor acted with fraudulent intent, not the intent to hinder or delay a creditor at issue here. Furthermore, the debtor's transfer in Stern was between two exempt retirement accounts, there was no direct evidence probative of intent, and the circumstantial evidence was little more than the timing of the transfer in question. Beverly, 374 B.R. at 241 (summarizing Stern, 345 F.3d 1036).

In contrast, in this contest, Debtor's transfers effectively converted assets from non-exempt to exempt status, there is direct evidence probative of intent, including Debtor's own testimony about his pre-bankruptcy intentions, and the circumstantial evidence of Debtor's intent goes beyond the timing

-16-

of the transfers.

The discharge denial analysis in Beverly is more on point than Stern. Indeed, the Panel published Beverly "to dispel the myth that the toleration of bankruptcy planning for some purposes insulates such planning from all adverse consequences—it does not." 374 B.R. at 226. There, a lawyer, anticipating a large judgment on community debt, employed a marital settlement agreement to transfer virtually all of the couple's non-exempt assets to his soon-to-be former wife, in exchange for her relinquishment of the exempt assets that their creditors could not reach. Id. at 227. In reversing the bankruptcy court's decision to not deny the debtor's discharge, the BAP held the bankruptcy court had "overstat[ed] the effect of exemption planning". Id. at 244.

In Beverly, the Panel recognized that certain types of bankruptcy planning is permissible but observed that "the existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial of discharge." Id. at 245 (citing Smiley v. First Nat'l Bank of Belleville (In re Smiley), 864 F.2d 562, 568 (7th Cir. 1989); Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 874-76 (8th Cir. 1988); First Texas Savings Ass'n, Inc. v. Reed (In re Reed), 700 F.2d 986, 990-92 (5th Cir. 1983)). It further explained that while the line between legitimate bankruptcy planning and a prohibited intent to defraud a creditor is difficult to draw, "two things are certain about the line." Id. First, "denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from non-exempt to

-17-

exempt status." Id. And "[s]econd, there is a principle of 'too much.'" Id.

Contrary to Debtor's position here, as explained in Beverly, bankruptcy courts can properly rely on the debtor's conversion of non-exempt assets to exempt status, in conjunction with additional evidence of a debtor's intent, to support a denial of discharge under § 727(a)(2)(A). Here, relying on Beverly, the bankruptcy court identified evidence other than Debtor's transformation of property from non-exempt to exempt, and the timing thereof, to support its findings about Debtor's intent. Because of this, it did not err, as a matter of law, in finding that Debtor's bankruptcy planning was "too much" and supported a denial of discharge. Debtor argues that Beverly is "distinguishable for the candor in which the debtor expressed his intent to hinder, delay or defraud his creditors." Debtor's Br. at 45. But regardless of the extent of the facts in Beverly, the legal principles announced in that decision hold true here.

### 3. Totality of Circumstances

In isolation, many of the Debtors' transfers may seem to have been benign. However, in considering the totality of the circumstances, the bankruptcy court found that Debtor crossed the line from permissible prebankruptcy transactions to making prohibited transfers with an intent to hinder or delay a creditor. Debtor argues the bankruptcy court erred in its ultimate conclusion because "every circumstance that forms the 'totality' is flawed and cannot support the judgment that denied [Debtor's] discharge." Reply at 1. But when we examine Debtor's citations of error, we conclude that the bankruptcy court

-18-

committed no clear error in finding the facts.

### a. Admissions of Intent

Debtor argues that the bankruptcy court erred by finding his admitted desire to prefer some of his creditors equated to an admission that he intended to hinder or delay a creditor for purposes of § 727(a)(2)(A). But, to be accurate, Debtor admitted to more than intending to prefer certain creditors. Debtor explicitly testified that he preferred his mortgage lenders in order to keep funds from JPM and Shustak. Moreover, the bankruptcy court found Debtor's various admissions were only "additional evidence of his intent" to hinder or delay his creditors and also rested its decision on additional circumstantial evidence such as the timing and quantity of the prepayments, as well as their irregular nature and the fact that they were not yet legally due. It also took exception to the fact that the funds used to prepay the mortgage lenders originated from the equity in the Property that was available to creditors until it was monetized through the refinancing. Thus, the bankruptcy court properly considered Debtor's admissions as support of its finding of Debtor's intent to hinder or delay a creditor.

Debtor further argues his fear of Shustak's future unscrupulous collection actions were well founded and cannot support a finding that he intended to hinder or delay a creditor. But given the record, his supposed fear does not persuade the Panel that the bankruptcy court erred in finding he intended to hinder or delay Shustak's efforts to collect, both scrupulous and unscrupulous.

### b. Debtor's Meeting with Woods

Debtor argues that the bankruptcy court erred by relying on his meeting with attorney Woods as evidence of his intent, because the meeting preceded any of the critical transfers, and any intent he had at the time of that meeting was vitiated before he made those transfers.

But recall, bankruptcy courts may rely on a debtor's course of conduct, or other circumstantial evidence, to infer intent to hinder or delay a creditor. In re Woodfield, 978 F.2d at 618; In re Beverly, 374 B.R. at 243. Here, the bankruptcy court was not relying on Debtor's intent in meeting with Woods alone as sufficient to support a finding of his intent to hinder or delay a creditor. Rather, it found that the timing of Debtor's meeting with Woods, together with Debtor's knowledge and planning in doing so, was "additional evidence" that supported a finding of Debtor's intent to hinder or delay a creditor, particularly in prepaying his home loan lenders. In sum, the bankruptcy court appropriately relied on Debtor's intent in meeting with Woods as circumstantial evidence to supports its finding of Debtor's intent at the time he made the transfers to his creditors.

### c. Refinancing

The bankruptcy court found that, through refinancing, Debtor extracted almost $250,000 from equity in the Property, depleting almost all of it, and shielding the equity that exceeded the limited $100,000 homestead exemption. Debtor argues that the fact that he likely over-encumbered the Property via the refinancing should not be held against him because he believed the Property was worth more than the amount he borrowed when he

refinanced. But the bankruptcy court's findings show that it gave Debtor's version of the facts little weight. The bankruptcy court did not err in doing so. The Panel gives great deference to the bankruptcy court's determination of Debtor's credibility. Additionally, the limited amount of the new second mortgage loan and Debtor's admission that traditional lenders had declined to extend credit to him for a second mortgage support such a finding.

Debtor also argues his intent in refinancing was not to hinder or delay his creditors, but that he only intended to limit his dependence on the IRAs while he survived during the arbitration with JPM. But even if this was one reason Debtor refinanced, his intent to hinder or delay a creditor still warrants denial of discharge "notwithstanding any other motivation" for the transfer. In re Adeeb, 787 F.2d at 1343 (holding the intent to hinder or delay warrants denial of discharge "notwithstanding any other motivation" for the transfer).

For these reasons, the bankruptcy court did not err in finding that refinancing the Property supported a finding of Debtor's intent to hinder or delay a creditor and denial of his discharge.

### d.    The Transfers to Wife's CNB Account

Debtor next argues the bankruptcy court erred in considering his transfer of funds from his bank account to his wife's bank account as evidence of an intent to hinder or delay his creditors because it "overlooked" the fact that his wife had a community property interest in the funds in his account and the

-21-

community estate will remain liable for his debts.

In addressing a similar argument the bankruptcy court found that even though Debtor had a community property interest in Wife's CNB Account, and that creditors could potentially collect the funds transferred to that account, Debtor intended these transfers to make it difficult for his creditors to collect by putting the funds out of his name and into his wife's name and control. Furthermore, although Debtor testified the $86,000[9] that was transferred from Debtor's CNB Account to Wife's CNB Account was used to pay "customary bills," the bankruptcy court found that $61,000[10] of it was disbursed for the benefit of Debtor and his wife.

These findings are supported by the record and similarly defeat Debtor's present argument. Although Debtor's creditors may have the option of collecting through his wife's joint liability, they would nonetheless be hindered and delayed in doing so when compared to collecting directly from him. As such, the bankruptcy court did not err in finding Debtor made these transfers with the intent to hinder or delay a creditor.

### e. The Transfers to Clownputsch and Friends

In response to statements in JPM's brief, Debtor argues that the transfer of funds to his friends and the Clownputsch Account

---

[9] This amount includes the $18,000 transferred after the arbitration hearing, the $51,000 transferred after the FINRA award was entered against him, and the $17,000 transferred on the eve of bankruptcy.

[10] This is the difference between the $86,000 transferred to Wife's CNB Account and the $25,000 remaining in Wife's CNB Account as of the petition date.

were not evidence of his intent to hinder or delay a creditor.

The bankruptcy court did not rely on the transfer to the Clownputsch Account, and expressly stated the transfers to his friends did not support a finding of his intent to hinder or delay a creditor. As such, the Panel need not address these arguments.

### f. Intent to Hinder or Delay

In sum, the bankruptcy court relied on numerous facts to support its finding of Debtor's intent to hinder or delay a creditor. In addition to the foregoing facts, the bankruptcy court identified certain "badges of fraud" such as Debtor's close relationship with his wife, the timing of the transfers in relation to the FINRA action, Debtor's poor financial condition, and that substantially all of Debtor's property was transferred. Additionally, it found that Debtor's prepetition transfers caused a large dilution of non-exempt assets, and the approximately $250,000 in the non-exempt Debtor's CNB Account was reduced to $600 by the time of filing.

On this record, the bankruptcy court did not err in finding that Debtor made transfers with the intent to hinder or delay a creditor justifying the denial of his discharge under § 727(a)(2)(A).

### VI. CONCLUSION

The bankruptcy court committed no legal or factual errors. We AFFIRM.

-23-